UNITED STATES ex rel. Frank BROWN,
Petitioner,

v.

Robert G. SMITH, Warden, Vermont State
Prison, Respondent.

Civ. No. 3275.

United States District Court
D. Vermont.

Dec. 22, 1961.

Post-Judgment Motions Argued and
Decided Jan. 12, 1962.

Henry F. Black, White River Junction, Vt., John S. Burgess and Robert H. Gibson, Brattleboro, Vt., for petitioner.

Thomas M. Debevoise, Atty. Gen. of Vermont, Montpelier, Vt., and John Rocray, State's Atty. for Windham County, Brattleboro, Vt., for respondent.

Ralph L. Chapman, Brattleboro, Vt., Philip H. Hoff, Burlington, Vt., and Rowland Watts, New York City, for American Civil Liberties Union, amicus curiae.

TIMBERS, District Judge.*

## I.

## RELIEF SOUGHT AND GRANTED

Petitioner Frank Brown,[1] a prisoner in the Vermont State Prison at Windsor, filed a petition seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2241,[2]

claiming that his conviction in the Windham (Vt.) County Court of arson causing death (a capital offense equivalent to first degree murder under Vermont law [3]) and his sentence of life imprisonment, violate his federal constitutional rights.

The Court holds that the failure to accord petitioner a fair trial by a panel of indifferent jurors plus the denial of state appellate review, combined to deprive petitioner of his rights under the Constitution of the United States.[4] Moreover, this is an extraordinary case where issuance by this federal court of a writ of habeas corpus with respect to a state prisoner and, after hearing, the ordering of his discharge, is necessary to prevent a complete miscarriage of justice.[5]

Accordingly, the judgment of conviction and sentence of life imprisonment, being in violation of the Constitution of the United States, are set aside as void. Petitioner is entitled to be discharged from detention pursuant to such void judgment and sentence. His discharge, however, will be delayed for a reasonable period of time to enable the State of Vermont to take petitioner before the

---

* Of the District of Connecticut, sitting by designation.

1. Frank Brown, technically the "relator" in this habeas corpus proceeding, will be referred to in this opinion as "petitioner". He has been so referred to throughout this proceeding in the federal court. In the proceedings in the Vermont state courts, he was referred to as "respondent", as reflected by certain references in this opinion to the state court proceedings.

2. 28 U.S.C. § 2241 provides in pertinent part:
"(a) Writs of habeas corpus may be granted by the * * * district courts * * * within their respective jurisdictions.
* * * * * *
"(c) The writ of habeas corpus shall not extend to a prisoner unless * * *
* * * * * *
"(3) He is in custody in violation of the Constitution or laws or treaties of the United States * * *."

3. VT.STAT.ANN. tit. 13, § 501 (1959):
"A person who wilfully and maliciously burns the building of another, or wil-

fully and maliciously sets fire to a building owned in whole or in part by himself, by means of which the life of a person is lost, shall be guilty of murder in the first degree."

4. U.S.CONST. amend. XIV, § 1 (due process and equal protection clauses).

5. United States ex rel. Kulick v. Kennedy, 157 F.2d 811, 813 (2 Cir.1946) (opinion by Judge Learned Hand), rev'd sub nom. Alexander v. United States ex rel. Kulick, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947). See Chessman v. Teets, 354 U.S. 156, 172, 77 S.Ct. 1127, 1 L.Ed. 2d 1253 (1957) (opinion by Mr. Justice Douglas); Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); Brown v. Allen, 344 U.S. 443, 553, 73 S. Ct. 397, 97 L.Ed. 469 (1953) (opinion by Mr. Justice Black); Id. at 558, 73 S.Ct. at 436 (opinion by Mr. Justice Frankfurter); Frisbie v. Collins, 342 U.S. 519, 520–521, 72 S.Ct. 509, 96 L.Ed. 541 (1952); Wade v. Mayo, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647 (1948); Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923).

court where the judgment was rendered for the purpose of correcting, if susceptible of correction, the defects which render discharge necessary, pursuant to the order and judgment of this Court entered this day and appended hereto.[6]

## II.

### PROCEEDINGS IN THIS COURT

Petitioner filed a verified petition for writ of habeas corpus in this Court July 18, 1961. An order to show cause, entered by this Court (Honorable Ernest W. Gibson) July 20, 1961 and served on respondent the same day, ordered respondent to show cause July 27, 1961 why a writ of habeas corpus should not issue.

July 20, 1961, Judge Gibson disqualified himself from sitting on this matter. The same day, pursuant to 28 U.S.C. § 292(b), the Acting Chief Judge of the Court of Appeals for the Second Circuit designated the undersigned to sit in the District of Vermont to hear and determine this matter.[7]

Pursuant to such designation, a hearing was held before the undersigned in Brattleboro, with sessions July 27, August 14, 15, 16, September 12 and December 22, 1961.

The July 27 session was in the nature of a pretrial hearing, following which the Court entered an order directing, among other things, that appropriate pleadings be served and filed; that the complete record of all proceedings in the Windham

County Court and the Vermont Supreme Court in the case of State of Vermont v. Frank Brown,[8] be lodged with the Clerk of this Court in Brattleboro forthwith; that the hearing on this matter resume August 14 and continue in successive daily sessions until concluded; that witnesses and documents be subpoenaed accordingly; that petitioner be present at the August 14 session and at all subsequent sessions; that the first issue to be considered and ruled on at the August 14 session would be whether petitioner had exhausted his state remedies; that, in the event the Court should rule that petitioner had exhausted his state remedies, counsel should be prepared to go forward August 14 with the hearing on the merits; and that the application of the American Civil Liberties Union for leave to participate as amicus curiae be granted.[9]

At the August 14 session, after hearing argument by counsel, the Court made a preliminary determination that petitioner had exhausted his state remedies.[10] Thereafter, the August 14, 15 and 16 sessions were devoted largely to identifying, marking in evidence and referring to exhibits, including the records of the state court proceedings; taking judicial notice of relevant provisions of the Vermont Constitution and statutes; and to recording stipulations of counsel in open court with respect to certain relevant details of state court practice

---

6. Irvin v. Dowd, 366 U.S. 717, 728–729, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Chessman v. Teets, supra note 5, at 166, 77 S.Ct. at 1133; Dowd v. United States ex rel. Cook, 340 U.S. 206, 209–210, 71 S.Ct. 262, 95 L.Ed. 215 (1951); Tod v. Waldman, 266 U.S. 113, 120–121, 45 S.Ct. 85, 69 L.Ed. 195 (1924); Mahler v. Eby, 264 U.S. 32, 46, 44 S.Ct. 283, 68 L.Ed. 549 (1924); United States ex rel. Reid v. Richmond, 295 F.2d 83, 84 n. 2 (2 Cir. 1961), cert. denied, 368 U.S. 948, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961); Grandsinger v. Bovey, 153 F.Supp. 201, 240 (D.Neb. 1957), aff'd, 253 F.2d 917 (8 Cir.1958), cert. denied, 357 U.S. 929, 78 S.Ct. 1373, 2 L.Ed.2d 1371 (1958).

7. Such designation was extended September 13, 1961 by the Chief Judge of the

Court of Appeals for the Second Circuit.

8. 121 Vt. 459, 160 A.2d 879 (1960); 122 Vt. 59, 163 A.2d 845 (1960).

9. "Memorandum And Order", dated July 27, 1961, in this proceeding (Civ.No. 3275).

10. R. 77–79 (August 14, 1961). (References to the hearing in this proceeding in this Court will be to the page numbers of the stenographic transcript thereof, followed by the date of the session of the hearing, e.g. "R. 77–79 (August 14, 1961)". The pages of the transcript of the sessions of July 27, August 14, 15 and 16 are numbered 1–285; the transcript of the September 12 session is numbered 1–66).

which did not appear altogether clear to the Court upon its initial examination of the state court record (e. g. the conduct of the voir dire examination of prospective jurors and the function of "assistant judges" in the trial of a criminal case).

After the August 16 session was concluded, counsel were allowed time within which to serve and file briefs, proposed findings of fact and conclusions of law. A transcript of the hearing was prepared by the official court reporter and furnished to counsel. Oral arguments were heard September 12. The Court announced its decision in open court and entered its order and judgment December 22.

## III.

## FEDERAL CONSTITUTIONAL QUESTIONS RAISED

Petitioner has raised in this Court a number of federal constitutional questions, the most serious of which, and with respect to which he has exhausted his state remedies, are the following:

*First.* Whether the claimed failure to accord petitioner a fair trial by a panel of indifferent jurors constituted denial of due process in violation of the Fourteenth Amendment?

*Second.* Whether the claimed denial of state appellate review of a conviction equivalent to first degree murder which resulted in the imposition of a sentence of life imprisonment, following failure to accord a fair trial, constituted denial of due process and equal protection in violation of the Fourteenth Amendment?

As stated above, this Court holds on the record before it that both questions must be answered in the affirmative. These conclusions are based on the following findings of fact and evaluations of the facts as found.

## IV.

## DENIAL OF A FAIR TRIAL BY A PANEL OF INDIFFERENT JURORS

Petitioner was indicted July 23, 1959 [11] for having burned a building in Brattleboro December 26, 1958 as a result of which Lyman Streeter lost his life.[12] The State claimed the fire was started in a ground floor drug store which was managed and controlled by petitioner and that Streeter died of asphyxiation resulting from inhaling smoke in the third floor apartment which he occupied.[13]

## A. State's Public Disclosure of Petitioner's Alleged Criminal Record

■ July 27, 1959 petitioner was arraigned on this indictment in the Windham County Court. He pleaded not guilty.[14]

Thereupon, the Deputy Attorney General, representing the State,[15] immediately moved that petitioner "be committed

11. Pursuant to VT.STAT.ANN. tit. 13, § 501 (1959), set forth supra note 3.

12. Pet.Ex. I–T–1. (References to exhibits marked at the hearing in this proceeding in this Court will be abbreviated thus: petitioner's exhibits will be designated "Pet. Ex.", followed by the Roman numeral designating the particular exhibit, "I", followed by the letter designating the particular paper in that exhibit, "T", followed by the page number of the paper referred to, "1"; e.g. "Pet. Ex. I–T–1." Corresponding abbreviations will be used in referring to respondent's exhibits, e.g. "Resp. Ex. B–1.")

13. Pet. Ex. VIII, 125–128, 408.

14. Pet. Ex. VII, 1–2 (July 27, 1959). (The proceedings July 27, 1959 on the arraignment and motion for bail were presided over by Superior Judge Leonard W. Morrison. All other proceedings in the Windham County Court, including the trial, were presided over by Superior Judge Harold C. Sylvester.

Since Pet. Ex. VII contains three separate transcripts of three separate proceedings on three different dates, each of which begins with its own page one, this Court will specify the date of the hearing when referring to this exhibit.)

15. Pursuant to Vt.Stat.Ann. tit. 3, § 157 (1959).

to Waterbury for observation and determination of his sanity".[16] The court overruled the motion.[17]

Petitioner then moved for bail.[18] In support of this motion, he called Dr. Ruml who testified that petitioner had been his patient for a year or a year and a half; that six or seven months before the hearing petitioner had suffered a coronary attack from which he recovered; that about two months before the hearing petitioner suffered an acute attack of heart failure from which he also recovered; and that in the doctor's opinion the chances of recurrence of such attacks would be less if petitioner were admitted to bail than if he were committed to jail pending trial.[19]

On cross examination, the Deputy Attorney General asked the doctor:[20]

"Q. Now, Doctor, would it make any difference in your opinion if the individual whom we are discussing, if you learned the individual whom we are discussing has been previously arrested and incarcerated on the following convictions?"

Petitioner's counsel objected on the ground that "it is highly prejudicial."[21] The court asked the Deputy Attorney General, "What do you say about the element of prejudice?"[22] After the Deputy Attorney General explained he was trying "to see if the doctor has all the facts regarding the background,"[23] the court suggested, "Why don't you simply ask whether without skirting the element of prejudice?"[24] The Deputy Attorney General then asked the doctor:[25]

"Q. Would it make any difference to your opinion, Doctor, if it were the fact that on thirty-six different occasions this respondent has been charged with at least one crime?"

Petitioner's counsel again objected; the court overruled the objection.[26] The doctor replied, "No, I don't think it would."[27] The Deputy Attorney General persistent in asking the doctor:[28]

"Q. It is six weeks between now and trial, about six weeks. Would it make any difference to your opinion if the respondent on at least eight different occasions spent periods of time longer than six weeks in jail?"

The doctor replied in the negative.[29]

On re-cross examination of the doctor, the Deputy Attorney General prefaced his opening question with this observation:[30]

"Q. I respect your opinions and don't appear to be nasty or sarcastic about them. In fact I am not nasty or sarcastic because I am sure they are genuine."

In argument to the court opposing the motion for bail, the Deputy Attorney General stated:[31]

"We could call the respondent to the stand in this proceeding but the only purpose would be to go into the part of his criminal record which I have here, just received special delivery from Boston. This is the part when he was in Boston between 1928 and 1944. And I don't want to prejudice the respondent."

The court, after deliberation, denied the motion for bail with the observation, " * * * this man is charged with a capital crime and in view of that we deny

16. Pet. Ex. VII, 2 (July 27, 1959).
17. Id. at 3.
18. Id. at 4.
19. Id. at 5–6.
20. Id. at 7.
21. Id. at 7.
22. Id. at 7.
23. Id. at 7.
24. Id. at 8.
25. Id. at 8.
26. Id. at 8.
27. Id. at 8.
28. Id. at 8.
29. Id. at 8.
30. Id. at 9.
31. Id. at 9.

your motion for bail and you may have exceptions to that." [32]

**Evaluation**

In view of the prominence given by the press to petitioner's alleged criminal record and in view of the number of jurors later empanelled to try petitioner who had read about the case in the newspapers (6 of the 12 regular jurors, as well as the 2 alternates [33]), the following is the Court's evaluation of the justification for the Deputy Attorney General's injection of petitioner's alleged criminal record into the proceedings on the motion for bail:

(i) The doctor had expressed a simple but logical opinion with respect to the relative chances of recurrence of petitioner's coronary or heart failure attacks if he were admitted to bail as compared with being confined to jail.

(ii) Petitioner's heart ailments, to which the doctor referred, had occurred within a period of 6 or 7 months prior to the hearing.

(iii) To test the validity of the doctor's opinion and ostensibly to show that petitioner would be as much at home inside as outside jail, the Deputy Attorney General pressed his inquiry about "thirty-six different occasions" when petitioner "has been charged with at least one crime" and about "at least eight different occasions" when petitioner "spent periods of time longer than six weeks in jail".

(iv) What the Deputy Attorney General failed to disclose to the doctor but did disclose to the court at the very end of the hearing, was that petitioner's alleged criminal record related to a period of time 15 to 31 years earlier—obviously having not the slightest relevance to the heart condition about which the doctor testified.

(v) Aside from being irrelevant to the doctor's testimony, such a criminal record (assuming a segregation of arrests from convictions) under Vermont law would not be admissible even if petitioner had taken the witness stand at the trial in his own behalf; for only convictions *within 15 years* of crimes involving moral turpitude can be used to impeach the credibility of a witness.[34]

(vi) Had the Deputy Attorney General seriously believed that an alleged record of petitioner's arrests and convictions antedating the hearing by more than 15 years was relevant to the issue of likelihood of flight on a motion for bail involving an offense as to which the accused had no right to bail under the Vermont Constitution,[35] surely such record could have been brought to the attention of the court in such a manner as to safeguard against the publicity and prejudice which flowed from the manner in which the Deputy Attorney General forced the disclosure in this case—prejudice which the record here shows was instantly recognized by the court, by petitioner's counsel and by the Deputy Attorney General.[36]

In short, the public disclosure of petitioner's alleged criminal record, with its devastating effect—alone and in combination with other factors—upon petitioner's chances for a fair trial by a panel of indifferent jurors, was directly attributable to the State. It was "a gross impropriety on the part of the prosecuting officials [to have] made

32. Id. at 10.

33. P. 901 infra. See Appendix A, infra.

34. VT.STAT.ANN. tit. 12, § 1608 (Supp. 1961).

At the January 12, 1962 hearing in this Court on petitioner's motion to be admitted to bail pending respondent's appeal to the Court of Appeals, the present Attorney General of Vermont (who took office January 1, 1962) with commendable candor disclosed that, according to records in possession of the State, petitioner has not been arrested or convicted *since 1941* (except for the conviction out of which the instant habeas corpus proceeding arises); in other words, with this exception, petitioner's record is clear, not only from 1944, but for a period of 20 years.

35. VT.CONST., Ch. II, § 32; cf. In re Dexter, 93 Vt. 304, 314–316, 107 A. 134, 137–138 (1919).

36. Pet. Ex. VII, 7, 8, 9 (July 27, 1959).

available to the press all this damaging material respecting [petitioner]."[37]

## B. Petitioner's Motion For Change of Venue

■ July 28, 1959, the day following arraignment of petitioner and denial of his motion for bail, there appeared in The Brattleboro Daily Reformer (Brattleboro's only daily newspaper) a front page, right hand column story (the space reserved for the lead local story) with a 24 point type head reading:[38]

"BROWN HELD
FOR ARSON
TRIAL IN SEPT."

Directly under this head was a subhead, referred to as a three line hanger, reading:[39]

"BAIL DENIED BY
COURT: RECORD OF
36 ARRESTS CITED"

The story itself, reciting the events of the previous day's session in the Windham County Court, while omitting to mention that petitioner pleaded not guilty, did mention the denial of the Deputy Attorney General's motion to have petitioner committed to the Waterbury State Hospital, the setting of the trial date for September 15 and the denial of petitioner's motion for bail.[40] In connection with the latter, there was a summary of Dr. Ruml's testimony, including the following questioning by the Deputy Attorney General (all on the front page, right hand column):[41]

"Deputy Atty. Gen. Debevoise asked Dr. Ruml is [sic] he would change his opinion if he knew that the respondent had been charged on 36 different occasions with at least one crime and had been sentenced at least eight times to serve longer than six weeks in jail in Massachusetts, according to his Boston criminal record between 1928 and 1944."

September 4, 1959, almost two months before the trial got under way, petitioner filed a motion for change of venue.[42] Under the Vermont statute,[43] either the State or the accused may move for change of venue where the offense is punishable by death or imprisonment in the state prison. The motion alleged, among other grounds, that "there have been several accounts published in the Brattleboro Daily Reformer which indicate along with many other prejudicial things, that the respondent is the possessor of a record of thirty-six arrests and it is respectfully submitted that such a representation said to have been made by the Deputy Attorney General and widely published throughout Windham County by the said Brattleboro Daily Reformer, cannot help but prejudice the respondent."[44]

At the hearing on petitioner's motion for change of venue on October 1, 1959, the following facts, among others, were established:

(1) That subsequent to the fire on December 26, 1958, and more particularly from June 11, 1959 to and including July 29, 1959, the matter of the fire and petitioner's involvement received wide and extensive coverage in the Brattleboro Daily Reformer.[45]

(2) In addition to the publication of petitioner's alleged criminal record, this newspaper on July 25, 1959 published on its front page such statements as the

37. Delaney v. United States, 199 F.2d 107, 114, 39 A.L.R.2d 1300 (1 Cir.1952). See United States v. Bando, 244 F.2d 833, 837-838 (2 Cir.1957), cert. denied, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957) and United States v. Bufalino, 285 F.2d 408, 420 (2 Cir.1960) (concurring opinion by Judge Clark).

38. Pet. Ex. II–A; Pet. Ex. VII, 2–3 (October 1, 1959).

39. Ibid.

40. Pet. Ex. II–A.

41. Ibid.

42. Pet. Ex. I–P.

43. Vt.Stat.Ann. tit. 13, § 4631 (1959).

44. Pet. Ex. I–P–1.

45. Finding by Presiding Judge Harold C. Sylvester, Pet. Ex. I–M–2.

following concerning the fire and petitioner's connection therewith: [46]

"His arrest followed a long investigation by the State Fire Marshal's Office climaxed recently by exhumation of Streeter's body for an autopsy."

"State Pathologist Richard S. Woodruff of Burlington reported his findings were that Streeter's death was caused by smoke inhalation."

"Brown drove up to the police station in a blue Cadillac convertible . . . . "

(3) A three-column, six inch square photograph of petitioner "on his way to jail" (according to the caption) prior to his arraignment was published on the front page of the Brattleboro Daily Reformer on July 25, 1959 [47]—"largely based on the need of size in order to do justice to the subject." [48]

(4) The Brattleboro Daily Reformer on April 1, 1959 had a net paid circulation of 7,108, all except approximately 600 being in Windham County. Of the 7,108 total circulation, 4,412 were distributed in the Brattleboro Town Zone where the paper had a 90.80% coverage of all families, and 2,158 were distributed in the Brattleboro Trading Zone (within a 25 mile radius of Brattleboro [49]) where the paper had a 75.69% coverage of all families. [50] The paper had a circulation in 16 towns of Windham county. [51]

(5) During the same period of time referred to in paragraph (1) supra, Brattleboro radio station WTSA broadcast petitioner's involvement in the fire, his arrest, his arraignment and other news items in connection therewith. [52]

(6) Radio station WTSA, which has a coverage within approximately a 25 mile radius of Brattleboro, has a large listening audience; [53] it serves a population (including areas outside of Vermont) of 87,800 people where there are 30,300 homes, of which 28,810 are radio equipped; and there are 20,410 radio equipped automobiles in the area. [54]

(7) All broadcasts by radio station WTSA concerning petitioner's involvement in the fire, his arrest, his arraignment and other news items in connection therewith, were based on U.P. releases; such broadcasts were made two or more times a day; samples of such releases were marked as exhibits. [55]

(8) A lawyer who had practised for 25 years in Windham County, was then first vice president and later president of the Vermont Bar Association and who lived in Newfane (where petitioner later was tried for arson), testified without objection that, based on his discussions with "people throughout the county" concerning the news releases about the fire and the proceedings against petitioner:

"My opinion is that the publicity attending the arrest of Mr. Brown has definitely created prejudice against him." [56]

46. Pet. Ex. II–C.

47. Ibid.

48. Pet. Ex. VII, 3 (October 1, 1959).

49. Pet. Ex. II–E; Pet. Ex. VII, 7 (October 1, 1959).

50. Pet. Ex. II–E; Pet. Ex. VII, 2 (October 1, 1959); see also Finding by Presiding Judge Harold C. Sylvester, Pet. Ex. I–M–2.

51. Pet. Ex. II–E. Based on the 1960 Census, Brattleboro had a population of 11,734; Windham County, a population of 29,776. Resp. Ex. B.

52. Finding by Presiding Judge Harold C. Sylvester, Pet. Ex. I–M–2; Pet. Ex. VII, 8–12 (October 1, 1959).

53. Ibid.

54. Pet. Ex. VII, 9 (October 1, 1959).

55. Pet. Ex. II–F–G–H; Pet. Ex. VII, 9–12 (October 1, 1959).

56. Pet. Ex. VII, 13 (October 1, 1959). On cross examination, the Deputy Attorney General brought out that this lawyer had represented clients who had sued petitioner—"I have never been on his side. I have always been against him." Id. at 14. Also, over objection on cross ex-

The State offered no evidence in opposition to petitioner's motion for change of venue.[57]

At the conclusion of the hearing, the court inquired of counsel, " * * * if this motion were granted what county do you have in mind it should be changed to?" Counsel for petitioner replied, " * * * in any of the other thirteen counties of the State." The Deputy Attorney General replied, "I think the counties are all the same in the State." [58]

The court took the motion under advisement.[59] October 8, 1959 the court made certain findings of fact.[60] It recited the nature and extent of newspaper and radio coverage of the fire and of petitioner's involvement therein; it observed that "the articles appear nothing more than abstract reporting, the type of 'news story' we have become familiar with, know of and are little influenced or impressed by"; it characterized the radio broadcasts as "nothing more than a dissemination of a normal news topic of more than average interest to the inhabitants of Windham County"; it referred to the testimony of the vice president of the Vermont Bar Association as having "expressed the opinion that [petitioner] could not receive a fair and impartial trial in the County" (which was *not* his testimony) and then added, "We have given this opinion such weight as we think it is entitled to receive"; and it expressed "every confidence that counsel will be able to protect [petitioner's] rights" upon the voir dire examination of prospective jurors when "any knowledge

of the case or prejudice will quickly appear and we of course must assume that all queried will answer truthfully." Accordingly, petitioner's motion for change of venue was denied, with an exception to petitioner.[61]

October 26, 1959, the opening day of the trial, counsel for petitioner renewed the motion for change of venue. The court again denied the motion, without comment, and granted petitioner an exception.[62]

Evaluation

The disclosure of petitioner's alleged criminal record, of the investigation by the State Fire Marshal's Office climaxed by exhumation of Streeter's body for an autopsy, of the findings of the State Pathologist as to the cause of Streeter's death and of the complicity of petitioner in the alleged crime before he was tried, before he was arraigned and before he was indicted—disclosures which emanated from the law enforcement and investigatory officials of the State of Vermont—were given "wide and extensive coverage in the Brattleboro Daily Reformer" and "were placed on the air at least twice in each instance and quite possibly more than twice" over "Radio station WTSA [which] has a large listening audience within its broadcasting area."[63] This publicity by newspaper and radio blanketed Windham County, reaching the saturation point in Brattleboro and its environs, from which a jury was to be drawn to try petitioner for a crime defined as first degree murder under Vermont law. The difficulty presented by

amination, the Deputy Attorney General asked, "Are you saying, Mr. Crispe, that Mr. Brown cannot get a fair trial in this county?", to which the witness replied, "I am not." Id. at 15. From an experienced lawyer, that answer of course would be expected in response to the ultimate question to be decided by the court; nor is such answer inconsistent with his opinion that publicity had created prejudice against petitioner throughout the county.

57. Pet. Ex. VII, 15 (Oct. 1, 1959).

58. Id. at 16.

59. Id. at 15.

60. Pet. Ex. I–M.

61. Id. at 3.

62. Pet. Ex. VIII, 2. The court did not rule on petitioner's motion for additional findings of fact in connection with the motion for change of venue. Ibid; Pet. Ex. I–O. For aught that appears in the record before this Court, no ruling was ever made on that motion.

63. Finding by Presiding Judge Harold C. Sylvester, Pet. Ex. I–M–2.

such publicity in getting a fair trial for the accused has been expressed by the Court of Appeals for this Circuit as follows:[64]

"We again stress the obligation that rests upon all law enforcement agencies to avoid making any public statements concerning the progress of the investigation of a crime or the proof already obtained as to the complicity of any person who is either a defendant or likely to be prosecuted for the crime. Judge Edelstein's opinion ([United States v. Dioguardi, D.C.] 20 F.R.D. 33) properly condemned publicity emanating from law enforcement officials in criminal prosecutions in general, and in this case in particular, because of the difficulty it creates in getting a fair trial for the accused."

## C. Voir Dire Examination of Prospective Jurors

■ After disposing of certain preliminary matters,[65] the empanelling of the jury began in the Windham County Court at Newfane (12 miles from Brattleboro) Monday, October 26, 1959, at 2 P.M. It continued through that day, all of the following day and was completed the third day, October 28, at 10:25 A.M.[66] A jury of twelve, plus two alternates, was empanelled.

### Method of Conducting Voir Dire Examination

The method of conducting the voir dire examination was as follows.[67] The box was filled with twelve prospective jurors drawn by lot. An improvised witness oath was administered. The remaining veniremen retired to the jury rooms downstairs to await being called to replace those excused. The twelve prospective jurors in the box were examined as a group and individually—always in the presence of the others in the box. Those excused for cause were dismissed immediately. Dismissal of those challenged peremptorily was deferred until the end of that session of court, i. e. the noon recess or the recess at the end of the day. Those excused, whether for cause or peremptorily, were replaced immediately. Only the replacements for those excused for cause took seats in the jury box immediately. The replacements for those challenged peremptorily were seated temporarily in front of the jury box until the next recess. The replacements were examined in the presence of each other and those not excused; except that the replacements for those challenged peremptorily were examined in the presence of all in the box, including those who had been challenged peremptorily but were unaware of it.

In this manner the voir dire examination was conducted at all times in the presence of twelve or more prospective jurors, including those in the box as it was constituted from time to time who ultimately were among those empanelled as the jury of twelve. For example, three of the twelve jurors ultimately empanelled to try petitioner—jurors Larabee, Isham and Jenness—were among the original twelve veniremen called to the box;[68] they were present throughout the

---

64. United States v. Bando, 244 F.2d 833, 837–838 (2 Cir.1957), cert. denied, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957). See United States v. Bufalino, 285 F.2d 408, 420 (2 Cir.1960) (concurring opinion by Judge Clark) and Delaney v. United States, 199 F.2d 107, 114 (1 Cir.1952).

65. Pet.Ex. VIII, 1–6 (including swearing of court officers, denial of petitioner's renewed motion for change of venue, denial of petitioner's challenge to the array and noting that petitioner proceeded with the empanelling of the jury

"subject to the exceptions which are already on record" Id. at 6).

66. Pet. Ex. VIII, 125. On the first day and before the voir dire examination began, the court announced that it "hoped to get a jury drawn this afternoon." Id. at 4. (The empanelling of the jury began on October 26, 1959, not September 26, 1959, as indicated on the first page of the transcript. Id. at 1.)

67. R. 231–237, 240–243, 247–248 (August 16, 1961) ; Pet. Ex. VIII, 4–125.

68. Pet. Ex. VIII, 6.

entire voir dire examination and heard each question asked and each answer given.[69]

The prospective jurors who were in the box when the court recessed from time to time during the voir dire examination were kept together by the court officers and were locked up in a Brattleboro hotel each night.[70]

Petitioner and the State each had six peremptory challenges, that being the number allotted in all criminal cases whether capital or non-capital.[71]

Of the 47 prospective jurors examined during the voir dire, 41 were drawn from the regular jury list[72] and 6 were talesmen[73] summoned in response to the court's direction to the sheriff.[74] Three of the talesmen thus summoned were empanelled as members of the jury of 12[75] and 2 of the talesmen were empanelled as alternates.[76]

Of the 33 prospective jurors who were excused, 6 were challenged peremptorily by petitioner, 3 were excused upon challenge for cause by petitioner, 21 were excused upon challenge for cause by the State and 3 were excused for cause by the court. No peremptory challenges were exercised by the State.[77]

### Disclosures During Voir Dire Examination

Of the 21 prospective jurors who were excused upon challenge for cause by the State, 8 were opposed to the death penalty in any case and 13 were opposed to the death penalty in a case of non-intentional killing.[78]

Of the 26 prospective jurors who were examined beyond the question of their scruples concerning capital punishment, 11 personally knew Streeter or members of his family; 8 had had their hair cut by Streeter or had been in his barber shop; 4 were members of fraternal orders to which Streeter belonged; none knew petitioner or members of his family; 5 had traded at petitioner's drug store; 13 had read or heard publicity about the fire and petitioner's connection therewith, in newspapers or on radio or TV; 8 were subscribers to or regular readers of the Brattleboro Daily Reformer; 13 were aware of anti-Jewish sentiment but denied it would influence them as jurors.[79]

### Jury Empanelled To Try Petitioner

As a result of the voir dire examination, there emerged, to try petitioner for first degree murder, a jury of 12, plus 2 alternates, with the following badges of doubtful indifference:

(a) Five (3 regulars and 2 alternates) had known Streeter, 2 of the regulars for 10 years or more.[80]

(b) Four (3 regulars and 1 alternate) had had their hair cut by Streeter or had been in his barber shop, including the husband of one of the regulars who was a customer of Streeter.[81]

(c) Two regulars were members of fraternal orders to which Streeter be-

---

69. R. 247 (August 16, 1961).

70. Pet. Ex. VIII, 13, 20, 37, 79.

71. Vt.Stat.Ann. tit. 12, § 1941 (1959).

72. Vt.Stat.Ann. tit. 12, §§ 1401–1405 (1959).

73. Vt.Stat.Ann. tit. 12, § 1451 (1959).

74. "Mr. Sheriff, it appears that there is not a sufficient number of jurors in attendance to fill or complete the panel for the trial of this case. So you are directed to summon a sufficient number of judicious persons, resident of this county to complete the panel." Pet. Ex. VIII, 90–91.

75. Pet. Ex. VIII, 113–114.

76. Id. at 119, 124–125.

77. Pet. Ex. VIII, 4–125; Appendix B, infra, sets forth an evaluation of the voir dire examination of prospective jurors, excluding those empanelled as petit jurors.

78. Appendix B, infra.

79. Appendix B, infra; Appendix A, infra, sets forth an evaluation of the voir dire examination of those empanelled as petit jurors (12 regulars and 2 alternates).

80. Pet. Ex. VIII, 10, 93, 109, 111, 116, 120.

81. Id. at 10, 93, 109, 111, 120.

longed;[82] one regular and the husband of another were members of a veterans organization to which Streeter belonged.[83]

(d) While none knew petitioner or any members of his family, 3 regulars had traded at his drug store; a fourth had traded there for 11 years before petitioner acquired it, but not since.[84]

(e) Eight (6 regulars and 2 alternates) had read, heard or seen publicity about the case in newspapers, on radio or TV.[85]

(f) Eight regulars were subscribers to or regular readers of the Brattleboro Daily Reformer.[86]

(g) Nine (8 regulars and 1 alternate) · were aware of anti-Jewish sentiment.[87]

*Other Occurrences During Voir Dire Examination*

The following also occurred during the voir dire examination of prospective jurors:

(1) Having in mind the public disclosure by the Deputy Attorney General of petitioner's alleged criminal record and the publicity by newspaper and radio which blanketed Windham County concerning the case and petitioner's connection with it, this line of inquiry by the Deputy Attorney General to the prospective jurors takes on special significance:[88]

"MR. DEBEVOISE: * * * Now lastly but perhaps most important to both the State and the respondent in this case, there has been some newspaper stories, news stories about the fire that happened in this case and other stories about the matter. Have any of you seen such stories in the papers?

[Two prospective jurors indicate in the affirmative.]

"I believe when the indictment was returned in this case there was also some stories about Mr. Brown in connection with the fire. Has anyone seen any of those stories?

[A prospective juror indicates she may have.]

"In addition to news stories in the newspapers there have also been news broadcasts, radio and television. Have any of you seen or heard such stories on the radio or television?

[A prospective juror indicates in the affirmative.]"

Questions in like vein were asked again and again by the Deputy Attorney General.[89]

█ (2) More than half of the voir dire examination consisted of questions by the Deputy Attorney General on the subject of punishment. Granted that it was a proper subject of inquiry in a capital case, by the same token appropriate restraint should have been exercised to safeguard against the inevitable prejudice which resulted from the following:

(a) On at least seven occasions,[90] the Deputy Attorney General, *without stat-*

---

82. Id. at 96, 103.

83. Id. at 18, 103.

84. Id. at 51, 96, 109, 112.

85. Id. at 33, 34, 47, 57–58, 94–95, 101, 110–111, 117, 120.

86. Id. at 35, 48, 97, 110–111.

87. Id. at 18–19, 54, 96–97, 103–104, 112, 124.

88. Pet. Ex. VIII, 32–33.

89. Pet. Ex. VIII, 15, 47, 57, 66–67, 74, 84, 94–95, 101, 110, 117, 120. Typical of the Deputy Attorney General's references to publicity about the case during the voir dire examination were:

"Everybody at one time or another has seen something about it in the paper." Id. at 15.

"I am not asking you about the facts of this particular case which you may have read something about or heard something about." Id. at 45.

"I am not talking about anything you may have read or heard about this particular case." Id. at 72.

"I am not talking about the facts of what happened here or anything you may have read." Id. at 73.

90. Pet. Ex. VIII, 45, 55 (twice), 81, 92, 99, 100.

*ing that it first would be necessary to find the accused guilty*, asked prospective jurors whether they would hesitate to vote for the death penalty, thus implying that the sole function of the jury about to be empanelled was to determine the degree of punishment. For example, he asked the prospective juror Mrs. Allen: [91]

> "The crime here charged is that Frank Brown set fire to a building and as a result of the fire Lyman Streeter lost his life. That crime, the legislature has said, shall be punishable at the choice of the jury, either by death or life imprisonment. In principal are you opposed to the death penalty?"

(b) Although each prospective juror was asked whether he or she would hesitate to vote to impose the death penalty, *not a single one was asked whether he or she would hesitate to vote for life imprisonment* if petitioner were found guilty.[92]

(c) At no time during the voir dire examination were the prospective jurors told that *intent to commit arson was a necessary element of the crime charged.* On the contrary, the Deputy Attorney General emphasized the absence of any necessity of showing intent to kill:[93]

> "MR. DEBEVOISE: In this case the statute provides that where somebody sets fire to a building and

another person dies as a result, there is no necessity to charge that there was any premeditation or malice to kill that individual. The crime is setting fire to the building * * *.*"

And another instance:[94]

> "MR. DEBEVOISE: * * * It wasn't necessarily a premeditated killing."

(3) At the very outset, before the empanelling of the jury began, one of the members of the Grand Jury that indicted petitioner for arson causing death was sworn as a Deputy Sheriff to act as a court officer, including the handling of the petit jury, at the trial of petitioner.[95] Disclosure that this Deputy Sheriff had served on the Grand Jury came after flat denials to the contrary by the Deputy Attorney General and the clerk.[96] Only after persistent pressing of the inquiry by petitioner's counsel, did the court finally order, "We won't permit him to have anything to do with the jury." [97]

(4) One of the prospective jurors, who had known Streeter for four or five years and had had his hair cut by him,[98] recalled that "Mrs. Streeter (widow of the victim of the fire) was a deputy here when I served on a jury before. * * *"[99]

(5) Mrs. Jenness, one of the jury of 12 empanelled to try petitioner, was friendly with a member of the Grand

---

91. Id. at 45.

92. Id. at 4–125.

93. Id. at 72.

94. Id. at 83.

95. Id. at 1.

96. Id. at 1–2.

97. Id. at 2. The extent to which this Deputy Sheriff had been in contact with prospective jurors before this incident is not clear. The record shows that at the time of imposition of sentence, petitioner's counsel, in the presence of the Deputy Attorney General, informed the court that " * * * the day of this man's arraignment in this very Courtroom he [the Deputy Attorney General] and I stood outside this Courtroom door conversing in a pleasant manner and a man who later turned out we discovered, a man who attempted to become sworn as an officer of this Court taking care of this jury when he knew he was a member of that Grand Jury himself,—he came up to us and asked what happened about the Brown case, whether he pleaded guilty and told Tom Debevoise and I two jokes, one funny, the other questionable taste, based on two store keepers talking, snapped around and said, 'Business is good I see.' The other came to his neighbor store keeper, looked with some surprise and said, 'I heard you had a fire.' And Ikey replied and said, 'Tomorrow.'" Pet. Ex. VII, 11 (November 24, 1959).

98. Pet. Ex. VIII, 65.

99. Ibid.

Jury that returned the indictment;[100] the Grand Juror told Mrs. Jenness "a week or so later" that "she had been on the jury that caused the indictment."[101]

(6) The court refused to excuse for cause, upon challenge by petitioner, a prospective juror who had been prosecuted by petitioner's counsel when the latter was State's Attorney;[102] despite the existence of clear ground for this venireman to be excused for cause, the Deputy Attorney General vehemently objected;[103] petitioner thereupon was compelled to exercise a peremptory challenge.[104]

(7) Another prospective juror, drawn the first day of the voir dire examination, who had "known the whole Streeter family", made it abundantly clear that "it would prejudice me;"[105] despite the Deputy Attorney General's willingness to excuse her for cause,[106] the court persuaded her to change her position,[107] whereupon the Deputy Attorney General withdrew his motion;[108] the court then denied petitioner's motion to excuse her for cause;[109] and not until the *following day* (after she had remained in the jury box for a full day and had been locked up overnight with the others then in the jury box), was she eventually excused by the court with the observation, "I think we can get somebody untainted with any prejudice." [110]

(8) Still another prospective juror said she "was resentful" over "business dealings with [petitioner] which were unpleasant;"[111] although the State in fairness asked that this juror be excused for cause,[112] the court refused to excuse her at first;[113] thereafter, in response to a question whether her discussions of the case with others "concerned the formation of an opinion as to the guilt or innocence of Mr. Brown," she said, "* * * Everybody discussed it. There were pros and cons."[114] Not until the *following day* (after she likewise had remained in the jury box for a full day and had been locked up overnight with the others then in the jury box), did the court excuse her for cause, with the observation that " * * * if the respondent were convicted here. It would be a matter for him to feel probably someone on the jury he had had a disagreement with and that person might have influenced the others." [115]

(9) The wife of a member of the Brattleboro Fire Department [116] expressed the view that "Of course every time the fire alarm blows it might mean both police and fire, it means danger";[117] when asked if "it would make it any more difficult for you to reach an impartial verdict as between the State in an arson case and the respondent?", she answered, "It might";[118] when asked if "It might

100. Pet. Ex. VIII, 17.

101. Ibid.

102. Pet. Ex. VIII, 66–71.

103. Id. at 70.

104. Id. at 71.

105. Id. at 31.

106. Id. at 31.

107. Id. at 31–32.

108. Id. at 32.

109. Id. at 43.

110. Id. at 80.

This was one of a number of prospective jurors who, despite admitted prejudice or bias (for which they ultimately were excused), nevertheless were permitted to remain in close association with the other veniremen in the box for long periods of time, frequently overnight; for example, prospective jurors Bolster (supra notes 105–110), Sauer (infra notes 111–115) and Burbank (infra notes 116–121). The court's apparent condoning of such admitted prejudice or bias as long as these prospective jurors were permitted to remain in the box, surely had its impact on the other veniremen.

111. Id. at 12.

112. Id. at 12.

113. Id. at 12.

114. Id. at 16.

115. Id. at 42.

116. Id. at 19.

117. Id. at 19.

118. Id. at 41.

require a lot more evidence or proof to satisfy you one way or the other in this particular type of a case?", she answered, "I think so";[119] nevertheless she was kept in the jury box until the *following day* (after being locked up overnight with the others then in the jury box), before being excused by the court upon challenge by petitioner for cause [120] and then only over vigorous protest by the State.[121]

(10) Another prospective juror, before being excused for cause,[122] expressed in no uncertain terms the depth of his prejudice "for one side or the other";[123] that he had formed an opinion "as to the guilt or innocence of [petitioner]";[124] and such opinion was "On the basis of something [he had] read or heard."[125]

(11) " * * * a sympathy with Mrs. Streeter which would prejudge this case"[126] to the point that he "could not determine the guilt or innocence of [petitioner] strictly upon the facts"[127] was expressed by another prospective juror before he was excused by the court.[128]

(12) Mr. Threlkeld, one of the alternates empanelled,[129] was acquainted with Streeter on the basis of "that relationship as I was in his chair in the barber shop;"[130] had read in the Brattleboro Reformer and the Rutland Herald that Brown "was charged with the fire";[131] and had "been back to the barber shop since the fire"[132] when he made the comment to the other barbers "that I noticed about the happening in the paper and was very sorry, that sort of thing."[133]

(13) Mr. Timmes, one of the regular jurors empanelled and who served as foreman,[134] when asked, since he was a subscriber to the Brattleboro Reformer,[135] whether he had read anything "about the fire or Mr. Brown's connection with it", replied, "I did read, it was in the paper about trying to collect fire insurance";[136] and he had been in Brown's drug store "within a month before the fire".[137]

(14) Mr. Merritt, another of the regular jurors empanelled,[138] had done appraisal work for the State of Vermont in highway cases.[139]

After the voir dire examination was concluded and a jury of 12 regulars, plus 2 alternates, had been empanelled, the clerk read the indictment and stated to the jury: [140]

> "The respondent has been arraigned in open Court and has entered a plea of not guilty and placed himself upon the country for trial, which country, ladies and gentlemen of the jury, you are."

**Evaluation**

The voir dire examination of prospective jurors must be evaluated [141]

---

119. Id. at 41.

120. Id. at 43.

121. Id. at 41–42.

122. Id. at 16.

123. Id. at 15.

124. Id. at 15.

125. Id. at 15.

126. Id. at 11.

127. Id. at 11.

128. Id. at 11.

129. Id. at 124.

130. Id. at 120.

131. Id. at 120.

132. Id. at 120.

133. Id. at 120.

134. Id. at 113, 400.

135. Id. at 48.

136. Id. at 47.

137. Id. at 51.

138. Id. at 113.

139. Id. at 59.

140. Id. at 125.

141. Indeed, Presiding Judge Harold C. Sylvester, as a ground for denial of petitioner's motion for change of venue, stated that:
> "We . . . are satisfied upon examination of prospective jurors on their voir dire that any knowledge of the case or prejudice will quickly appear and we of course must assume that all queried will answer truthfully and we have every confidence that counsel will be able to protect the [petitioner's] rights." Pet. Ex. I–M–3.

in the light of the State's public disclosure of petitioner's alleged criminal record [142] and the disclosures made on petitioner's motion for change of venue [143] to determine whether petitioner was brought to trial before a panel of impartial, indifferent jurors, the denial of which would violate the minimal standards of due process.[144]

The disclosures during the voir dire examination—referring particularly to those enumerated in the preceding section of this opinion [145]—are significant in that they occurred in the presence of all prospective jurors in the box or elsewhere in the courtroom, including at all times at least three of those who ultimately were empanelled to try petitioner for first degree murder; [146] the prospective jurors who were in the box when the court recessed from time to time during the voir dire examination were kept together by the court officers and were locked up each night; [147] the conduct of the voir dire examination extended over portions of three days of the trial; [148] during long periods of this time, frequently overnight, certain prospective jurors, who were clearly disqualified because of bias or prejudice and ultimately were excused for that reason,[149] nevertheless remained in close association with the other veniremen in the box, including some who sat in judgment of petitioner; and, for aught that appears in the record before this

Court, the prospective jurors were at liberty to discuss among themselves what occurred during the voir dire examination.[150]

The chief significance of the voir dire examination, in the opinion of this Court, is that it reflected the climate of the courtroom and the pulse of the community in which petitioner was brought to trial. The community being a relatively small one, its pulse was more sensitive than might have been the case in a larger community to such influences as disclosure of petitioner's alleged criminal record; [151] sympathy for the victim of the fire—a life-long resident of the community who was a popular barber; [152] prejudice against the accused—a foreign born man of the Jewish faith who had lived in the community for only two years [153] and, although not well known in the community, had made enemies as the proprietor of a cut rate drug store; [154] and the saturation coverage of the community with stories about the fire, petitioner's complicity in the alleged crime and the State's investigation of the crime.[155]

The federal constitutional question here presented is whether on this record petitioner was tried for first degree murder by a panel of impartial and indifferent jurors; if not, of course he did not receive a fair trial—indeed, in the eyes of the law, he received no trial at all—and was denied due process in

142. Pp. 893–895, supra.

143. Pp. 896–899, supra.

144. Irvin v. Dowd, 366 U.S. 717, 721–722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); Tumey v. Ohio, 273 U.S. 510 47 S.Ct. 437, 71 L.Ed. 749 (1927).

145. Pp. 901–904, supra.

146. Supra notes 67, 68, 69.

147. Supra note 70.

148. Supra note 66.

149. For example, prospective jurors Bolster (supra notes 105–110), Sauer (supra notes 111–115) and Burbank (supra notes 116–121).

150. While the Presiding Judge during the voir dire examination instructed the jury not to disclose their deliberations, he also told them, "Of course during the trial of the case you will undoubtedly discuss it among yourselves. * * *". Pet. Ex. VIII, 113–114.

151. Pp. 893–895, supra.

152. Pet. Ex. II–A, C.

153. Pet. Ex. VIII, 3, 89; Petition For Writ of Habeas Corpus, sworn to July 15, 1961, p. 1, in this proceeding (Civ. No. 3275).

154. Pet. Ex. VIII, 12.

155. Pp. 896–897, supra.

violation of the Fourteenth Amendment.[156]

Determination of impartiality is not easy. It is not susceptible of solution by an exact science. There are no absolutes upon which a court may rely. Chief Justice Hughes, speaking for the United States Supreme Court, said:[157]

"Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."

█ The one clear mandate to a federal district court in a habeas corpus proceeding in determining whether a state prisoner was tried by an *impartial* jury in the *constitutional* sense is that " * * the District Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge."[158] Mr. Justice Holmes put it this way: "We shall not say more concerning the corrective process afforded to the petitioners than that it does not seem to us sufficient to allow a Judge of the United States to escape the duty of examining the facts for himself when if true as alleged they make the trial absolutely void."[159] In determining, when a prisoner's life or liberty is at stake, whether there has been a denial of due process of law because of trial by jurors lacking impartiality, the United States Supreme Court recently prescribed what this Court understands to be its precise function in the instant proceeding: "It was, therefore, the duty of the [federal court] to independently evaluate the *voir dire* testimony of the impaneled jurors."[160] "And the object of habeas corpus is to search records to prevent illegal imprisonments."[161]

█ In complying with the mandate of the United States Supreme Court to search the records of the state court proceedings and independently to evaluate the voir dire examination for the purpose of determining whether petitioner was tried by a jury of sufficient impartiality to comply with constitutional due process standards, the Court has endeavored scrupulously to refrain from reviewing the record from the standpoint of appellate error, that being exclusively a state court function under our federated system.[162] Moreover, the Court recognizes the broad discretion appropriately granted to state trial courts in ruling on such matters as motions for change of venue[163] and challenges for cause in the empanelling of a jury.[164] It is not the province of a federal court in a habeas corpus proceeding involving the legality of detention of a state prisoner to determine whether error was committed by the state courts. It is, however, clearly the duty of the federal court in such a proceeding to determine whether due process was denied. The distinction is

---

156. U.S.CONST. amend XIV, § 1 (due-process clause).

157. United States v. Wood, 299 U.S. 123, 145–146, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936).

158. Brown v. Allen, 344 U.S. 443, 507, 73 S.Ct. 437, 446, 97 L.Ed. 469 (1953) (opinion by Mr. Justice Frankfurter).

159. Moore v. Dempsey, 261 U.S. 86, 92, 43 S.Ct. 265, 267, 67 L.Ed. 543 (1923).

160. Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961).

161. Brown v. Allen, supra note 158, at 553, 73 S.Ct. at 433 (opinion by Mr. Justice Black).

162. Moore v. Dempsey, supra note 159, at 91, 43 S.Ct. at 266; Frank v. Mangum, 237 U.S. 309, 335, 35 S.Ct. 582, 590, 59 L. Ed. 969 (1915).

163. State v. Watson, 114 Vt. 543, 49 A.2d 174 (1946); State v. Stacy, 104 Vt. 379, 411, 160 A. 257, 747 (1932).

164. State v. Meyer, 58 Vt. 457, 3 A. 195 (1886), overruled on other grounds, State v. Burpee, 65 Vt. 1, 25 A. 964, 19 L.R.A. 145 (1892); State v. Tatro, 50 Vt. 483 (1878).

vital. This Court has done its best to discharge its duty in this proceeding strictly within the confines of its habeas corpus jurisdiction.[165]

 Vermont has written into its organic law articulate safeguards not only for trial by jury but for trial by an *impartial* jury:

" * * * The parties have a right to trial by jury, which ought to be held sacred." [166]

" * * * in all prosecutions for criminal offenses, a person hath a right to * * * a speedy public trial by an impartial jury of the country." [167]

" * * * great care ought to be taken to prevent corruption or partiality in the choice and return, or appointment of Juries." [168]

And the Vermont Supreme Court requires the standard of "utmost impartiality" in the conduct of a trial: [169]

" * * * it is the duty of the court to conduct a trial with the utmost impartiality and fairness * *. This obligation extends throughout the trial."

Agreement by a state with federal constitutional due process standards, however, does not foreclose inquiry by a federal court in a habeas corpus proceeding into whether federal standards have been complied with in a particular state court proceeding; nor is a federal court foreclosed in such a case from setting aside a conviction for denial of due process.[170]

 In the instant case, "after a long, hard look at the whole picture presented" [171] and based on "an appraisal of the totality of facts",[172] this Court holds that petitioner was tried by a jury clearly lacking impartiality and his "conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception." [173]

On the record before this Court, it might well hold that due process was denied petitioner "at nearly every step of the proceedings." [174] Such holding, however, is not necessary to the decision in this case and the Court does not decide it on that basis. The Court does hold that the combination of facts disclosed by this record establish beyond any doubt that the jury empanelled to try petitioner for a crime defined as first degree murder was not an impartial, indifferent jury. Accordingly, petitioner was denied a fair trial in violation of the due process clause of the Fourteenth Amendment.

 The State's public disclosure of petitioner's alleged criminal record under the circumstances outlined above [175] struck the initial blow at petitioner's right to a fair trial.[176] The influence of

---

165. See 1 Moore's Federal Practice, ¶0.230[2], p. 2704 (2d ed. 1960), for an excellent, concise statement of "Federal Habeas Corpus to Discharge from State Custody."

166. VT.CONST., Ch. I, Art. 12.

167. VT.CONST., Ch. I, Art. 10.

168. VT.CONST., Ch. II, § 30.

169. Morse v. Ward, 102 Vt. 433, 150 A. 132, 133 (1930).

170. Irvin v. Dowd, supra note 160, at 724 & n. 4, 81 S.Ct. at 1643.

171. United States ex rel. Sheffield v. Waller, 126 F.Supp. 537, 545 (W.D.La. 1954), application for probable cause denied, 224 F.2d 280 (5 Cir.1955), cert. denied, 350 U.S. 922, 76 S.Ct. 217, 100 L. Ed. 807 (1955).

172. Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595 (1942).

173. Irvin v. Dowd, supra note 160, at 730, 81 S.Ct. at 1646 (opinion by Mr. Justice Frankfurter).

174. United States ex rel. Sheffield v. Waller, supra note 171, at 546.

175. Pp. 893–895, supra.

176. See Delaney v. United States, 199 F.2d 107 (1 Cir. 1952), where convictions were reversed because of the prejudicial effect of adverse publicity upon defendant's right to a fair trial. In disregarding a previously unbroken line of authority and holding that *despite* the jury's solemn avowal of its ability to decide the case solely on the basis of the evidence produced at the trial and without regard to any extraneous influence such as news-

that poisonous injection permeated all subsequent proceedings—to such an extent that "Here the build-up of prejudice is clear and convincing. An examination of the then current community pattern of thought as indicated by the popular news media is singularly revealing."[177]

The unfortunate and disturbing effect of such publicity has been well stated by Judge Charles E. Clark (with whose views in this respect Chief Judge Lumbard and Judge Friendly agreed): [178]

> "From its inception this case was given unusual and disturbing publicity in newspapers, journals, and magazines; and this unfortunate feature has persisted up to this date, with even the prosecutors indulging in highly colored accounts while the case has been pending on appeal.
>
> \* \* \* \* \* \*
>
> "This is vastly unfortunate; not only does it go beyond the judicial record necessary for its support, but it suggests that the administration of the criminal law is in such dire straits that crash methods have become a necessity. But it seems we should have known better, and a prosecution framed on such a

doubtful basis should never have been initiated or allowed to proceed so far. For in America we still respect the dignity of the individual, and even an unsavory character is not to be imprisoned except on definite proof of specific crime. And nothing in present criminal law administration suggests or justifies sharp relaxation of traditional standards."

▮ In holding that petitioner was tried by a jury lacking the impartiality required for due process, the Court is mindful that the jurors empanelled disclaimed any prejudice or partiality; otherwise of course they would not have been accepted. The constitutional test of impartiality, however, does not turn on the subjective declarations of the individual jurors. "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father."[179] Recalling the impact of the State's public disclosure of petitioner's alleged criminal record, "The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man."[180]

---

paper publicity adverse to defendant, the court held:

> "One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity." Id. at 112–113.

The three factors upon which the court relied in reaching its conclusion, contrary to prior authority, were: (1) the nature of the publicity itself; (2) that the government was the source of the publicity; and (3) the timing of the publicity.

177. Irvin v. Dowd, supra note 160, at 725, 81 S.Ct. at 1644. As in the instant case, there was a similar pattern of blanket coverage of the community by the news media in the Dowd case:

> "\* \* \* the newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County and \* \* \* in addition, the Evansville radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents. These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously \* \* \*." Ibid. "The headlines announced \* \* \* that he faced a lie detector test." Ibid. He was described "as having been found sane by a court-appointed panel of doctors." Id. at 726, 81 S.Ct. at 1644.

178. United States v. Bufalino, 285 F.2d 408, 420 (2 Cir. 1960).

179. Irvin v. Dowd, supra note 160, at 728, 81 S.Ct. at 1645.

180. Id. at 727, 81 S.Ct. at 1645; Delaney v. United States, supra note 176, at 112–113.

■ The record before the Court in this proceeding discloses facts which tend to show that if petitioner had been tried by an impartial jury, he might well have been acquitted. Six months after petitioner was convicted in the Windham County Court of arson causing death, a jury in a civil case in the United States District Court for the District of Vermont at Burlington (140 miles north of Brattleboro) found, by special verdict, that the fire (for the setting of which petitioner was convicted of arson causing death and sentenced to life imprisonment) was not "of incendiary origin." [181] The civil case was one brought by the Harry Soffer Drug Co. Inc. (owner of the drug store where the fire occurred) against several insurance companies to recover on the fire insurance policies covering the store at the time of the fire.[182] While differences between the criminal and civil cases with respect to such matters as the parties, the issues and the evidence [183] may be open to debate, the one critical fact common to both cases is that *the fire was*

*the same.* And yet one jury drawn from Windham County found it was of incendiary origin; another jury drawn from the Burlington area reached the opposite conclusion. The relevance of this to the issue of whether petitioner was tried by an impartial jury is: it robs petitioner's claim, particularly that there should have been a change of venue, of any purely academic character.[184]

■ The United States Supreme Court has succinctly summarized the historic, fundamental principle here involved—the guarantee to the criminally accused of a fair trial by a panel of impartial jurors: [185]

"England, from whom the Western World has largely taken its concepts of individual liberty and of the dignity and worth of every man, has bequeathed to us safeguards for their preservation, the most priceless of which is that of trial by jury. This right has become as much American as it was once the most English. Although this Court has

181. Harry Soffer Drug Co., Inc. v. Twin City Fire Insurance Company et al., Civil Actions Nos. 2761 and 2763 (D.Vt. April 14, 1960); see also State v. Brown, 122 Vt. 59, 61–65, 163 A.2d 845, 847–849 (1960).

182. Ibid.

183. Plaintiff in the civil action produced two expert witnesses (Carr and Kennedy) to contradict the testimony of an expert witness (Harrison) who had testified for the State in the criminal case as to the incendiary nature of the fire; such experts (Carr and Kennedy), according to petitioner, were not available to him at the criminal trial. Ibid.

184. The juror Sibley, empanelled after petitioner had exhausted his peremptory challenges (Pet. Ex. VIII, 108, 113), was one of the 12 jurors who tried and convicted petitioner of arson causing death. On his voir dire examination, it was disclosed that he had known Streeter for 10 years; that Streeter had cut his hair; that he had traded at Brown's drug store; that he read the Brattleboro Reformer "regularly"; that he "read of the fire in the drug store last December"; that, when asked if he had "read anything of Mr. Brown's connection with the fire, accusations against Mr. Brown," he

replied, "I have read whatever was reported by the Reformer." (Id. at 109–112).

In addition to being a regular reader of the Brattleboro Reformer, it appears from the record that he also is a contributor to the newspaper. After the jury in the civil case found the fire was not of incendiary origin, Sibley wrote two letters to the editor of the Reformer (Pet. Exs. IX and X). In both letters he appears to be carrying the torch for the State in the criminal case. In his letter published in the April 16, 1960 issue of the Reformer, however, he puts two questions, one of which reads (Pet. Ex. IX):

"Secondly, if the Federal Court Jury has found as it has, why should not Frank Brown be walking the streets as a free man instead of serving a term of life imprisonment at Windsor?

"In other words, what is the basis of our courts: Technicalities of Law or Justice? I should like to be enlightened if any of our erudite legal readers have the answers or feel free to expound upon this rather strange situation.
"OTIS A. SIBLEY"

185. Irvin v. Dowd, supra note 160, at 721–722, 81 S.Ct. at 1642.

said that the Fourteenth Amendment does not demand the use of jury trials in a State's criminal procedure, Fay v. New York, 332 U.S. 261 [67 S.Ct. 1613, 91 L.Ed. 2043]; Palko v. Connecticut, 302 U.S. 319 [58 S.Ct. 149, 82 L.Ed. 288], every State has constitutionally provided trial by jury. See Columbia University Legislative Drafting Research Fund, Index Digest of State Constitutions, 578–579 (1959). In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. In re Oliver, 333 U.S. 257 [68 S.Ct. 499, 92 L.Ed. 682]; Tumey v. Ohio, 273 U.S. 510 [47 S.Ct. 437, 71 L.Ed. 749]. 'A fair trial in a fair tribunal is a basic requirement of due process.' In re Murchison, 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942]. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.' Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. Thompson v. City of Louisville, 362 U.S. 199 [80 S.Ct. 624, 4 L.Ed.2d 654]. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' Reynolds v. United States, 98 U.S. 145, 155 [25 L.Ed. 244]."

In the same case, Mr. Justice Frankfurter, with his characteristic acumen, states:[186]

"More than one student of society has expressed the view that not the least significant test of the quality of a civilization is its treatment of those charged with crime, particularly with offenses which arouse the passions of a community. One of the rightful boasts of Western civilization is that the State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure. These rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicably poisoned against him. How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception."

In short, this Court holds that "Where one's life [or liberty for life] is at stake —and accounting for the frailties of human nature—we can only say that in the light of the circumstances here the finding of impartiality does not meet constitutional standards."[187]

Petitioner Frank Brown never had a chance. The fountain of justice was poisoned before it began to flow.[188]

## V.

## DENIAL OF STATE APPELLATE REVIEW

■ Petitioner's appeal to the Vermont Supreme Court, which granted him leave to appeal in forma pauperis from his conviction of arson causing death and from his sentence of life imprisonment,

---

186. Id. at 729–730, 81 S.Ct. at 1646 (concurring opinion).

187. Id. at 727–728, 81 S.Ct. at 1645.

188. Lawrence, Free Press And Fair Trial (Second Circuit Judicial Conference, 1960), Appendix C, infra at p. 940.

was dismissed for lack of jurisdiction in a 3 to 2 decision, Judge Holden in strong dissent.[189]

The crux of this decision was that petitioner had failed to comply with the double filing requirement with respect to notices of appeal first enacted by the Vermont legislature in 1959.[190] Under these statutory provisions, petitioner was required, within thirty days from the date he was notified of the rendition of his judgment of conviction, to file a notice of appeal with "(1) the clerk of the court appealed to and (2) the clerk * * * of the tribunal appealed from * * *."[191] Petitioner's notice of appeal concededly was filed in time with the clerk of the court appealed to (the Vermont Supreme Court); but, according to the three judge majority of the Vermont Supreme Court, it was filed one day late with the clerk of the court appealed from (the Windham County Court.)[192] The two judge minority of the Vermont Supreme Court found that "The essential fact that an appeal had been undertaken was brought home to each court concerned and to the prevailing party on the trial below,—all within the time prescribed."[193]

The following is the chronology of events by which petitioner sought and was denied state appellate review of his conviction of a crime defined as first degree murder:

(1) November 5, 1959 the jury returned its verdict in the Windham County Court finding petitioner guilty of arson causing death and determining that his punishment should be life imprisonment.[194] Petitioner was sentenced accordingly November 24, 1959.[195] A judgment order dated November 24, 1959 was filed December 3, 1959,[196] on which date notification of the rendition of judgment was given by the county clerk to petitioner's attorneys of record.[197]

(2) December 2, 1959 petitioner's counsel wrote to Chief Justice Hulburd of the Vermont Supreme Court enclosing a petition "submitted to you directly in accordance with our telephone conversation of Tuesday afternoon."[198] This petition requested that petitioner be allowed to appeal in forma pauperis, that a transcript of the proceedings in the Windham County Court be furnished to petitioner at state expense and that counsel be assigned to represent petitioner on his appeal at state expense.[199] In his letter of December 2, 1959 to Chief Justice Hulburd, petitioner's counsel further stated, "In the event that the Court should decide to grant the petition, I will be glad to prepare any order felt necessary. Our time for appeal expires on Thursday, December 24, 1959.[200] I hope that we will be notified of the decision of the Court in time to take appropriate action."[201]

(3) December 15, 1959 the clerk of the Vermont Supreme Court wrote to petitioner's counsel advising that he had been "directed by the Court to inform

---

189. State v. Brown, 121 Vt. 459, 160 A.2d 879 (1960); Pet.Ex. III–J.

190. Vt.Stat.Ann. tit. 12, §§ 2382, 2383 (1959) (Acts of 1959, No. 261); amended by Acts of 1961, No. 181: now Vt. Stat.Ann. tit. 12, §§ 2382, 2383 (Supp. 1961).

191. Ibid.

192. State v. Brown, supra note 189, at 465, 160 A.2d at 883.

193. Id. at 469, 160 A.2d at 885.

194. Pet. Ex. I–L; Pet. Ex. VIII, 413. Jury determination of punishment—death or life imprisonment—was pursuant to Vt.Stat.Ann. tit. 13, § 2303 (1959).

195. Pet. Ex. I–L; Pet. Ex. VII, 13 (November 24, 1959). After imposing sentence, Presiding Judge Harold C. Sylvester said: "Mittimus stayed pending time in which the respondent may effect an appeal to the Supreme Court." Ibid.

196. Pet. Ex. I–L.

197. State v. Brown, supra note 189, at 461, 160 A.2d at 881.

198. Pet. Ex. XI–C.

199. Pet. Ex. I–I.

200. Actually, the 30 day period within which a notice of appeal was required to be filed, expired January 2, 1960, extended to January 4, 1960 because the expiration date fell on a Saturday.

201. Pet. Ex. XI–C.

you that your petition to be assigned as counsel for the respondent in the above-entitled case in his appeal to the Supreme Court has been granted"; the clerk further informed petitioner's counsel that "As to the payment of the transcript in the pursuance of your appeal, Chief Justice Hulburd wishes to inform you that he will seek to make some arrangements with the Attorney General as to that."[202]

(4) December 28, 1959 petitioner's counsel wrote to the clerk of the Windham County Court (copies to the Attorney General, the court reporter, and Hon. Henry F. Black, petitioner's co-counsel) stating, "Since the time for filing a notice of appeal under 12 V.S.A., Section 2383 is fast approaching in the above captioned matter, I want to make absolutely certain that all parties in interest understand the situation regarding the transcript." After referring to and summarizing the letter of December 15, 1959 from the clerk of the Vermont Supreme Court, petitioner's counsel went on to state, "In other words, I do wish to formally order the transcript in behalf of the appellant but can not furnish the check for the one-half estimate of the total cost as required by the court. I assume that Mr. Justice Hulburd has taken the matter up with the Attorney General and that some order or formal request will be made by that office for the transcript. If I am in error, I would appreciate being informed by the appropriate party."[203]

(5) With reference to the cost of the transcript, petitioner's counsel earlier that month, December 5, 1959, had written to the court reporter and concluded this letter by stating, "I will be glad to send you a check for whatever this will amount to, and will personally guarantee your charges entirely separate from the order which we are expecting from the Supreme Court."[204]

(6) December 31, 1959 petitioner's counsel mailed the original and three copies of petitioner's notice of appeal to the clerk of the Vermont Supreme Court in Montpelier under cover of a letter reading, "Enclosed please find original and three copies of the respondent's Notice of Appeal in the above captioned matter brought under 12 V.S.A., Section 2382. The extra copies are for the Windham County Clerk, Henry F. Black, Esq. and the Attorney General. I further enclose our check for $5.00 to cover filing fee. If I am in error as to the amount, please do not hesitate to correct me."[205]

(7) December 31, 1959 was a Thursday; the following day, New Year's Day, was a Friday.[206] Accordingly, the letter of December 31, 1959, from petitioner's counsel to the clerk of the Vermont Supreme Court enclosing the original and three copies of petitioner's notice of appeal, did not come to the attention of the clerk of the Vermont Supreme Court until the following Monday, January 4, 1960.[207]

(8) January 4, 1960 the clerk of the Vermont Supreme Court wrote to petitioner's counsel, "These papers on appeal should properly go to the Clerk of the Supreme Court within and for the County of Windham, rather than Clerk of the General Term, who will make the necessary distribution, and I have also endorsed the entry fee over to him as he is responsible for that. George Daley [Clerk of the Windham County Court] will prepare the docket entries in the case and certify it to us at a later date."[208]

(9) January 5, 1960 petitioner's counsel was in the Vermont Supreme Court at Montpelier, at which time the Clerk of the Supreme Court told him that on the previous day he had returned the notice of appeal and filing fee to the office

202. Pet. Ex. III–N.

203. Pet. Ex. I–B.

204. Pet. Ex. XI–B.

205. Pet. Ex. XI–A; State v. Brown, supra note 189, at 462, 160 A.2d at 881.

206. State v. Brown, supra note 189, at 462, 160 A.2d at 881.

207. Ibid.

208. Ibid.

of petitioner's counsel in Brattleboro. Petitioner's counsel thereupon immediately telephoned his office in Brattleboro and caused "all the papers in the case" to be handed to George Daley, who, by virtue of his office as county clerk for Windham County, is clerk of the Supreme Court for Windham County.[209]

(10) The same day, January 5, 1960, petitioner's counsel wrote to Mr. Daley, "I have just talked to Mr. Peduzzi [Clerk of the Vermont Supreme Court] who interprets the new statute as requiring the filing of the appeal with the Clerk of the Supreme Court for Windham County, so that he has sent back our notice of appeal and check for retransmittal to you. I have talked to Mr. Debevoise and I do not believe any question is going to be raised as to late filing. I will be back in town in the morning if you wish to talk with me about it." [210]

(11) January 5, 1960 the Clerk of the Windham County Court issued its mittimus directing that petitioner be committed to the Vermont State Prison at Windsor for the rest of his natural life.[211]

(12) January 6, 1960 the Sheriff executed the mittimus by committing petitioner to the state prison at Windsor and reading the mittimus to him.[212]

(13) January 6, 1960 the Clerk of the Windham County Court wrote to the Clerk of the Vermont Supreme Court in Montpelier enclosing a certified copy of the docket entries; noting that "the Notice of Appeal was filed with me after the Mittimus had been delivered to the Sheriff, and, after the 30 days for taking an appeal had expired"; stating, "If we were still operating under the old Court Rules the Court could waive the Rule and permit the respondent to file late, but, appellate procedure now being

statutory I do not know what authority the Court or a Judge would have in the matter. Mr. Burgess has paid the entry fee in the case so I think it a matter for the Supreme Court to decide rather than the Clerk"; and concluding by requesting the Clerk of the Vermont Supreme Court to notify him as to when the files in the case should be mailed to the Supreme Court.[213]

(14) January 8, 1960 the Clerk of the Windham County Court wrote to the Clerk of the Vermont Supreme Court enclosing the files "as per your request" and noting that "The Sheriff handed me the mittimus, which he had served at the State Prison, about 10 minutes after I had forwarded the copy of the docket entries to you." [214]

(15) January 15, 1960 petitioner's counsel wrote to the Clerk of the Windham County Court (copy to the Attorney General), stating, "Please refer to my letter of 28 December 1959 in which I formally ordered the transcript in the above captioned matter. As a result of my conversation with you this morning, you will find enclosed herewith our check in the amount of $182.50, being one-half the estimated cost of the transcript as given to me by Mrs. Billie Jones, Court Reporter. I would appreciate any influence you may have to expedite the furnishing of this transcript because it is my understanding that the Supreme Court would like to hear the matter in March, if possible." [215]

(16) January 18, 1960 the Clerk of the Windham County Court wrote to the Clerk of the Vermont Supreme Court, asking that a note be made on the docket of the filing of the request by petitioner's counsel for the transcript, together with his check for $182.50, and that the check had been forwarded to the court reporter.[216]

209. Ibid.

210. Pet. Ex. I–A.

211. Pet. Ex. I–G; State v. Brown, supra note 189, at 461, 160 A.2d at 881.

212. Pet. Ex. I–G; Pet. Ex. III–G.

213. Pet. Ex. III–H.

214. Pet. Ex. III–G.

215. Pet. Ex. III–F.

216. Pet. Ex. III–E.

(17) Upon motion of the Attorney General filed February 26, 1960,[217] the Vermont Supreme Court dismissed petitioner's appeal for lack of jurisdiction May 3, 1960.[218] Petitioner's motion for reargument, filed May 18, 1960,[219] was denied by the Vermont Supreme Court May 27, 1960.[220]

(18) The 30 day period[221] within which petitioner's notice of appeal was required to be filed[222] with the clerk of the court appealed to (the Vermont Supreme Court) and with the clerk of the court appealed from (the Windham County Court), expired January 2, 1960, extended to January 4, 1960 because the expiration date fell on a Saturday.[223] The Vermont Supreme Court held that petitioner's notice of appeal was filed on time with the clerk of the court appealed to;[224] but held that his notice of appeal was filed one day late with the clerk of the court appealed from.[225]

(19) May 4, 1960 petitioner filed in the Vermont Supreme Court a petition for a new trial supported by affidavits by each of his two attorneys, John S. Burgess, Esq. and Hon. Henry F. Black.[226] This petition was opposed by the Attorney General whose affidavit in opposition was filed May 24, 1960.[227] Arguments were heard by the Vermont Supreme Court on the petition for a new trial May 27, 1960.[228] September 6, 1960 the Vermont Supreme Court dismissed the petition for a new trial, one judge dissenting.[229]

## Evaluation

Denial of state appellate review of petitioner's conviction of arson causing death and his sentence of life imprisonment must be evaluated in the light of the earlier denial of a fair trial by a panel of indifferent jurors, in order to determine whether denial of state appellate review, under such circumstances and as applied to petitioner, was so unreasonable or so discriminatory as to constitute denial of due process or equal protection in violation of the Fourteenth Amendment. Accordingly, on the facts disclosed by this record, the Court evaluates the denial of state appellate review as follows:

(i) The crime of which petitioner was convicted and for which he was sentenced to life imprisonment is equivalent to the gravest crime under Vermont law—defined as murder in the first degree;[230] as such, it is punishable by death or life imprisonment, as determined by the jury.[231]

(ii) Appeals from convictions in capital cases are mandatory in some jurisdictions;[232] indeed, the Vermont legislature at its 1961 session, in direct response to the decision of the Vermont Supreme Court dismissing the appeal in the instant case,[233] made appellate review mandatory in "any criminal case resulting in a sentence of death or life imprisonment" and further provided that in such a case "no notice of appeal shall be necessary."[234]

(iii) Moreover, at the same session of the Vermont legislature, also in direct re-

217. Pet. Ex. III–M.

218. State v. Brown, supra note 189.

219. Pet. Ex. III–K.

220. State v. Brown, supra note 189.

221. VT.STAT.ANN. tit. 12, § 2383 (1959).

222. VT.STAT.ANN. tit. 12, § 2382 (1959).

223. State v. Brown, supra note 189, at 462, 160 A.2d at 881.

224. Id. at 465, 160 A.2d at 883.

225. Ibid.

226. Pet. Ex. IV–B, C, D.

227. Pet. Ex. IV–E.

228. R. 265 (August 16, 1961); R. 41, 42 (September 12, 1961).

229. State v. Brown, 122 Vt. 59, 163 A.2d 845 (1960); Pet. Ex. IV–A.

230. VT.STAT.ANN. tit. 13, § 501 (1959).

231. VT.STAT.ANN. tit. 13, § 2303 (1959).

232. See, e.g., ALA.CODE tit. 15, § 382(1) et seq. (1940); CAL.PEN.CODE § 1239(b).

233. R. 134–138 (August 15, 1961).

234. VT.STAT.ANN. tit. 12, § 2383 (Supp. 1961) (Acts of 1961, No. 181, § 2).

sponse to the decision of the Vermont Supreme Court dismissing the appeal in the instant case,[235] the double filing requirement with respect to notices ·of appeal was eliminated; the notice of appeal is now required to be filed only with "the clerk * * * of the tribunal appealed from * * *." [236]

(iv) The statute pursuant to which petitioner's appeal was dismissed for lack of jurisdiction, particularly the double filing requirement, was a new one, having been enacted by the Vermont legislature in 1959.[237]

■■■■■ (v) The double filing requirement of Vermont appellate procedure, even during its short-lived existence, was unique. Forty-six states have a single filing requirement; in these states, the

notice of appeal or its equivalent must be filed, depending on the applicable statute or rule of the state in question, *either* in the court from which the appeal is taken *or* in the court to which the appeal is taken—*not in both*.[238] Two states require notice of appeal or its equivalent to be made in open court below, plus filing in the appellate court.[239] One state requires "filing notice of appeal with the court rendering * * * judgment * * * and * * * filing a copy thereof in the appellate court where leave to appeal must be obtained." [240]

(vi) The new Vermont appellate procedure, enacted in 1959, resulted in some confusion among members of the Vermont bar as to where the notice of appeal should be filed, to whom the filing fee

---

235. Supra note 233.

236. Vt.Stat.Ann. tit. 12, § 2382 (Supp. 1961) (Acts of 1961, No. 181, § 1).

237. Vt.Stat.Ann. tit. 12, § 2382 (1959) (Acts of 1959, No. 261, § 46).

238. Ala.Code tit. 15, § 368 (1940); Alaska Comp. Laws Ann. § 69–6–2 (1949); ·Ariz. Sup.Ct. Rule 15 and Rules of Civil Proc. 73(b) (1956); Ark. Stat. § 43–2710 (1947); Cal. Rules on Appeal 31 (1955); Colo. Rev. Stat. Ann. § 39–7–24 to 39–7–27 (1953); Conn. Practice Book, § 378 (1951); Del. Supreme Court Rule 5(2) (1953); Fla. Stat. § 924.25 (Supp.1960) and Fla. Supreme Court Rule 12(3) (1956); Ga. Code Ann. § 6–801 (1935); Hawaii Rev. Laws § 208–1 (1955); Idaho Code Ann. § 19–2806 (1948); Ill. Ann. Stat. ch. 110, § 76(2) (Smith-Hurd 1956); Ind. Rules of Supreme and Appellate Courts 2–3 (1961); Iowa Code Ann. § 793.4 (1950); Kan. Gen. Stat. Ann. § 62–1718, § 62–1719, § 62–1724, (1949); La. Rev. Stat. § 15–542 (1950); Me. Rev. Stat. Ann. ch. 129, § 12 and ch. 148, § 30 (1954); Md. Rules of Procedure 811(a) (1958); Mass. Gen. Laws ch. 275, § 8 and ch. 212, § 22 (1932); Mich. Comp. Laws § 770.13 and § 650.-19 (1948); Minn. Stat. Ann. § 632.02 (1947);

Miss. Code Ann. § 1154 (1957); Mo. Ann. Stat. § 512.050 (1952); Mont. Rev. Codes Ann. § 94–8106 (1949); Nev. Rev. Stat. § 177.110 (1960); Neb. Rev. Stat. § 25–1912 (1961); N. H. Rev. Stat. Ann. § 490:11 (1955); N. J. Rules Governing The Courts 1:2–8 and 1:10–4 (1958); N. M. Stat. Ann. § 21–2–1(5) (3) and § 21–2–1(5) (5) (Supp.1961); N. Y. Code Crim. Proc. § 522 (1958); N. C. Gen. Stat. § 15–180 (1953) and § 1–280 (1953); N. D. Cent. Code § 29–28–08 to § 29–28–11 (1960); Ore. Rev. Stat. § 19.023(2) (1953); Pa. Stat. Ann. tit. 12, § 1133 (1953); R. I. Gen. Laws Ann. § 12–22–2 (1957); S. C. Code § 7–1 and § 7–4 (1952); S. D. Code ·§ 34.4102 (Supp.1952); Tenn. Code Ann. § 27–308, § 27–310, § 27–312 (1955); Tex. Code Crim. Proc. art. 827 (1948); Utah Code Ann. § 77–39–6 (1953); Va. Rules of Court 5:1 (§ 4) (1957); Wash. Rules on Appeal 46 (1961); W. Va. Rules of Sup. Ct. of Appeals· III(1) (1955); Wisc. Rev. Stat. Ann. § 958.13 and· § 274.11 (1958); Wyo. Rules of Civ. Proc. 1 and 73(a) (1959).

239. Ky. Crim. Code § 336(1) and § 336.(3) (1960); Okla. Stat. Ann. tit. 22, § 1055 (1958).·

240. Ohio Rev. Code Ann. § 2953.04 (Page·1954).

should be paid and to whom copies of the notice of appeal should be sent.[241]

(vii) The Vermont Supreme Court, prior to its decision dismissing petitioner's appeal in the instant case, had not construed the double filing provision of the newly enacted statute. In fact, the only other decision by the Vermont Supreme Court construing this provision of the statute was in a case argued on the same day and decided on the same day as the instant case.[242]

(viii) Petitioner in the instant case clearly notified both courts (the Windham County Court and the Vermont Supreme Court), as well as the prevailing party in the trial court, of his intention to appeal—which is the prime purpose of a notice of appeal; he did so by taking these steps:

(a) November 24, 1959, the day he was sentenced in the Windham County Court, he informed that court, in the presence of the Deputy Attorney General and the clerk of that court, in a written statement read in open court, that " * * I will appeal * * *."[243]

(b) By petition dated December 2, 1959 (accompanied by a letter to Chief Justice Hulburd), petitioner's counsel requested the Vermont Supreme Court that petitioner be allowed to appeal in forma pauperis, that a transcript of the proceedings in the Windham County Court be furnished petitioner at state expense and that counsel be assigned to represent petitioner on his appeal at state expense.[244]

(c) Petitioner's counsel took steps to order the transcript by writing to the court reporter on December 5, 1959 personally guaranteeing the charges [245] and by writing to the clerk of the Windham County Court on December 28, 1959 (copies to the Attorney General, the court reporter and petitioner's co-counsel) formally ordering the transcript and advising that he assumed Chief Justice Hulburd had taken up with the Attorney General the matter of the transcript and that "some order or formal request will be made by that office for the transcript." [246]

(ix) The Vermont Supreme Court on December 15, 1959 took official action in recognition of petitioner's notification of intention to appeal: it allowed him to appeal in forma pauperis; it assigned counsel to represent him on such appeal; and it informed him that arrangements would be made with the Attorney General to furnish him with a transcript of proceedings in the Windham County Court at state expense.[247]

(x) The clerk of the Windham County Court (who also is the clerk of the Vermont Supreme Court for Windham County) was notified, by the letter of Decem-

---

241. Pet. Ex. VI; Pet. Ex. IV–D–2; R. 84–98 (August 15, 1961). It may be noted that the statute, supra note 237, required the filing of "*a notice of appeal*"; presumably the filing of the *original* with the clerk of one court and provision of a *copy* for the clerk of the other court would constitute compliance with the requirement of "*a notice of appeal.*" That is precisely what petitioner's counsel did in mailing his letter of December 31, 1959. Pet. Ex. XI–A. But cf. Abbadessa v. Tegu, 121 Vt. 496, 160 A.2d 876 (1960).

242. Abbadessa v. Tegu, supra note 241.

243. Pet. Ex. VII, 12 (November 24, 1959). Petitioner's written statement, read by his counsel to the sentencing court, concluded with this paragraph:

"I have no money to fight the tremendous resources of my prosecutors, but *I will appeal* for a new trial. My lawyers, Mr. Burgess and Mr. Black, have been very kind. I have the greatest faith in and respect for both of them. I will do whatever they tell me. Whatever happens in the years ahead, somehow I have a deep feeling that the American system of justice will establish my innocence and set me free." (Emphasis added)

244. Pet. Ex. I–I; Pet. Ex. XI–C; supra notes 198, 199, 201.

245. Pet. Ex. XI–B.

246. Pet. Ex. I–B. This ordering of the transcript was in compliance with Rule 4A of the Rules of Practice of the Vermont Supreme Court and Rule 31(5) of the Rules of Practice of the County Court in Vermont.

247. Pet. Ex. III–N.

ber 28, 1959 from petitioner's counsel (a copy of which was sent to the Attorney General), of the action by the Vermont Supreme Court on December 15, 1959 in granting petitioner's motion for leave to appeal and in implementing such leave to appeal by assigning counsel and by arranging with the Attorney General for the furnishing of the transcript at state expense.[248] Such notice to the Windham County Clerk was filed when it was mailed.[249]

(xi) The difficulties encountered by petitioner's counsel in obtaining authorization from the Vermont Supreme Court and appropriate action by the Attorney General to order the transcript at state expense, appear to have accounted, at least in part, for the delay in filing petioner's formal notice of appeal.[250]

(xii) The record does not disclose what action was taken either by the Vermont Supreme Court or by the Attorney General in response to petitioner's requests that he be furnished with a transcript of the proceedings in the Windham County Court at state expense; nor, assuming the transcript was furnished at state expense, does the record disclose upon what date it was furnished or when petitioner or his counsel were notified that it would be furnished as requested.

(xiii) While there is no constitutional right of appeal in Vermont,[251]

statutes creating and regulating the right of appeal are remedial; as such, under Vermont law they are liberally construed in order to further, not restrict, the right of review.[252]

(xiv) Rule 73 of the Federal Rules of Civil Procedure is said to be the "root and stock"[253] of the new appellate procedure enacted by the Vermont legislature in 1959;[254] its "basic requirements are lifted verbatim from Rule 73",[255] with two significant variations:

(a) the Vermont statute (unlike Rule 73) requires that notice of appeal be given to the court to which the appeal is taken, as well as to the court from which the appeal is taken;

(b) the Vermont statute (unlike Rule 73) provides that mailing of the notice of appeal to the named persons is equivalent to filing.

(xv) It is a settled doctrine of statutory interpretation in Vermont that when a statute is adopted by that state, based on a statute of another jurisdiction, the judicial decisions construing the forerunner of the Vermont statute must be given effect; and the language of the Vermont statute, so adopted, is presumed to be used in the same sense given to it by prior adjudications of the jurisdiction of origin, absent some other sense impressed upon it by the derivative enactment.[256] Thus, construction of Rule

---

248. Pet. Ex. I–B.

249. VT.STAT.ANN. tit. 12, § 2383 (1959); Abbadessa v. Tegu, supra note 241.

250. Pet. Ex. XI–B; Pet. Ex. XI–C; Pet. Ex. I–I; Pet. Ex. III–N; Pet. Ex. I–B; Pet. Ex. III–F.

251. Roddy v. Fitzgerald's Estate, 113 Vt. 472, 475, 35 A.2d 668, 670 (1944); Miles Block Co. v. Barre & Chelsea R. R. Co., 96 Vt. 526, 527, 121 A. 410, 411 (1923).

252. Abbadessa v. Tegu, supra note 241; In re Estate of Pringle, 119 Vt. 8, 9, 117 A.2d 379, 380 (1955); Appeal of Maurice, 117 Vt. 264, 268, 90 A.2d 440, 443 (1952); In re Walker Trust Estate, 112 Vt. 148, 151, 22 A.2d 183, 185 (1941).

253. State v. Brown, 121 Vt. 459, 467, 160 A.2d 879, 884 (1960).

254. VT.STAT.ANN. tit. 12, §§ 2382, 2383 (1959) (Acts of 1959, No. 261, §§ 46, 47). Following § 2382, supra, there appears: "Derivation. Cf. Rule 73 of Federal Rules of Civil Procedure"; following § 2383, supra: "Derivation. Rule 73 of Federal Rules of Civil Procedure."

255. State v. Brown, supra note 253, at 467, 160 A.2d at 884.

256. Giguere v. E. B. & A. C. Whiting Co., 107 Vt. 151, 157, 177 A. 313, 316, 98 A.L.R. 196 (1935); In re Martin's Estate, 96 Vt. 455, 457, 120 A. 862 (1923); Bosquet v. Howe Scale Co., 96 Vt. 364, 371, 120 A. 171, 173 (1923); Warner v. Warner's Estate, 37 Vt. 356, 360–361 (1864); Adams v. Field, 21 Vt. 256, 266 (1849).

73 by the federal courts, prior to enactment by Vermont of its new appellate procedure in 1959, is deemed to have been adopted by Vermont.

(xvi) When the Vermont legislature enacted its new appellate procedure based on Rule 73, decisions of the federal courts construing that rule had long established that a timely petition for leave to appeal in forma pauperis constituted substantial compliance with the notice of appeal requirement of Rule 73.[257] "The rules have for their primary purpose the securing of speedy and inexpensive justice in a uniform and well ordered manner; they were not adopted to set traps and pitfalls by way of technicalities for unwary litigants [citation]. Therefore, substantial compliance with the rules is sufficient, and appellant's petition for leave to appeal in *forma pauperis* adequately met the requirements of Rule 73(a)."[258] And " * * * [T]he notice contained in the motion for leave to appeal in forma pauperis was sufficient, as the rules should be liberally construed and review should not be denied on mere technicalities where this can be avoided."[259]

(xvii) In the instant case, petitioner's application of December 2, 1959 to the Vermont Supreme Court for leave to appeal in forma pauperis;[260] the action of the Vermont Supreme Court in granting that application on December 15, 1959;[261] and petitioner's notification to the clerk of the Windham County Court on December 28, 1959 of the action of the Vermont Supreme Court in granting leave to appeal[262]—all well within the thirty day appeal period—constituted substantial compliance with the notice of appeal requirement of the Vermont statute.[263] This not only is in accord with the well settled construction by the federal courts of the notice of appeal requirement of Rule 73[264]—the "root and stock" of the Vermont statute[265]—which was adopted by the Vermont legislature when it enacted its new appellate procedure in 1959;[266] it also squares with Vermont law that the function of a notice of appeal, the form of which is not essential to jurisdiction, is to inform the parties and the courts involved that the controversy has not ended so that they may respond accordingly.[267]

Upon the facts disclosed by this record, the Court holds that denial of state appellate review of petitioner's conviction of arson causing death and his sentence of life imprisonment—following denial of a fair trial by a panel of indifferent jurors—was so unreasonable and so discriminatory as to constitute denial of due process and equal protection in violation of the Fourteenth Amendment.[268]

257. Roth v. Bird, 239 F.2d 257, 259 (5 Cir.1956); Burdix v. United States, 231 F.2d 893, 894 (9 Cir.1956), cert. denied, 351 U.S. 975, 76 S.Ct. 1041, 100 L.Ed. 1492 (1956); Des Isles v. Evans, 225 F.2d 235, 236 (5 Cir.1955); Shannon v. United States, 93 U.S.App.D.C. 4, 206 F.2d 479, 481–482 (D.C.Cir.1953); Randolph v. Randolph, 91 U.S.App.D.C. 170, 198 F.2d 956, 957 (D.C.Cir.1952); Fishbaugh v. Armour & Co., 185 F.2d 541, 542 (4 Cir.1950); 7 Moore's Federal Practice, ¶73.14, p. 3167 n. 27 (2d ed. 1955); cf. Steffler v. United States, 319 U.S. 38, 63 S.Ct. 948, 87 L.Ed. 488 (1943); Tesciona v. United States, 141 F.2d 811 (9 Cir.1944); Boykin v. Huff, 73 App.D.C. 378, 121 F.2d 865 (D.C.Cir. 1941).

258. Des Isles v. Evans, supra note 257, at 236.

259. Fishbaugh v. Armour & Co., supra note 257, at 542.

260. Pet. Ex. I–I.

261. Pet. Ex. III–N.

262. Pet. Ex. I–B.

263. Vt.Stat.Ann. tit. 12, §§ 2382, 2383 (1959).

264. Supra notes 257, 258, 259.

265. State v. Brown, 121 Vt. 459, 467, 160 A.2d 879, 884 (1960).

266. Supra note 256.

267. Appeal of Maurice, 117 Vt. 264, 269, 90 A.2d 440, 443 (1952).

268. U.S.Const. amend XIV, § 1 (due process and equal protection clauses).

While a state is not required by the Constitution of the United States to provide appellate courts or a right to appellate review at all,[269] once a state establishes a system of appellate review—particularly in criminal cases—then " * * * at all stages of the proceedings the Due Process and Equal Protection Clauses protect persons like [petitioner] from invidious discriminations."[270] As stated by Mr. Justice Frankfurter:[271]

"But neither the fact that a State may deny the right of appeal altogether nor the right of a State to make an appropriate classification, based on differences in crimes and their punishment, nor the right of a State to lay down conditions it deems appropriate for criminal appeals, sanctions differentiations by a State that have no relation to a rational policy of criminal appeal or authorizes the imposition of conditions that offend the deepest presuppositions of our society."

Denial of due process below in the instant case by failing to accord petitioner a fair trial by a panel of indifferent jurors,[272] sharpens the deprivation of due process in the denial of appellate review. Chief Justice Hughes put it this way:[273]

"As to the due process clause of the Fourteenth Amendment, it is sufficient to say that, as frequently determined by this court, the right of appeal is not essential to due process, *provided that due process has already been accorded in the tribunal of first instance.* McKane v. Durston, 153 U.S. 684, 687 [14 S. Ct. 913, 38 L.Ed. 867]; Pittsburgh, etc. Railway Co. v. Backus, 154 U.S. 421, 427 [14 S.Ct. 1114, 38 L.Ed. 1031]; Reetz v. Michigan, 188 U.S. 505, 508 [23 S.Ct. 390, 47 L.Ed. 563]; Rogers v. Peck, 199 U.S. 425, 435 [26 S.Ct. 87, 50 L.Ed. 256]; Standard Oil Company of Indiana v. State of Missouri, 224 U.S. 270, 286 [32 S.Ct. 406, 56 L.Ed. 760]." (Emphasis added)

The same principle, on broader grounds, has been expressed by Mr. Justice Black:[274]

---

269. McKane v. Durston, 153 U.S. 684, 687–688, 14 S.Ct. 913, 38 L.Ed. 867 (1894).

270. Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956).

271. Id. at 21, 76 S.Ct. at 592 (concurring opinion).

272. Pp. 893–910, supra.

273. Ohio ex rel. Bryant v. Akron Park District, 281 U.S. 74, 80, 50 S.Ct. 228, 230, 74 L.Ed. 710 (1930).

274. Daniels v. Allen, 344 U.S. 443, 553, 73 S.Ct. 397, 433, 97 L.Ed. 469 (1953) (dissenting opinion).
In the Daniels case, the majority of the Supreme Court held that denial of state appellate review, under the circumstances there present, did not violate the Federal Constitution (Id. at 482–486, 73 S.Ct. at 420–422). The Daniels case is distinguishable from the instant case in this important respect: there, not only did petitioners fail to serve a statement of the case on appeal within the 60 day period granted by the trial judge and did not do so until 61 days had expired, but neither petitioners nor their counsel made *any attempt whatsoever during the appeal period* to take their appeal in accordance with North Carolina's "easily-complied-with method of appeal" (Id. at 485, 73 S.Ct. at 421); here, petitioner and his counsel clearly notified both the trial court and the appellate court, as well as the Attorney General, of their intention to appeal and *took all steps necessary during the appeal period* to perfect the appeal, and did perfect the appeal as a matter of law, in accordance with Vermont's newly enacted, unique appellate procedure which had resulted in some confusion among members of the bar. (Pp. 915–916, supra).
Likewise, in United States v. Robinson, 361 U.S. 220, 80 S.Ct. 282, 4 L.Ed. 2d 259 (1960), where the Supreme Court was construing the Federal Rules of Criminal Procedure, appellants not only had failed to file notices of appeal within the 10 day period prescribed by Rule 37(a) (2) and did not do so until 21 days after the entry of judgment, but neither appellants nor their counsel *did anything whatsoever during the appeal period* to signify their intention to appeal (Id. at 220–221, 80 S.Ct. at 283–284);

"This denial of state appellate review plus the [denial of due process in the trial court] thus left uncorrected should be enough to make one of those 'extraordinary situations' which the Court says authorizes federal courts to protect the constitutional rights of state prisoners. Cf. Frisbie v. Collins, 342 U.S. 519, 520–521 [72 S.Ct. 509, 510–511, 96 L.Ed. 541]."

■ In holding that denial of state appellate review, under the circumstances disclosed by this record and as applied to this petitioner, constituted a denial of due process and equal protection in violation of the Fourteenth Amendment, the Court is mindful that it is treading in "a sensitive area in our federated system."[275] Neither the sensitivity of the area nor the difficulty of "application of constitutional principles to the facts as found",[276] however, would justify even a scintilla of vacillation on the part of the Court, confronted with this glaring record of deprivation of federal constitutional rights, in acting pursuant to the clear command of Congress and the forthright mandate of the Supreme Court to federal district judges sitting in habeas corpus proceedings.

Mr. Justice Frankfurter, speaking for the United States Supreme Court,[277] has defined the jurisdiction and appropriate function of the district courts in dealing with precisely the type of problems which confront the Court in the instant case :[278]

"The complexities of our federalism and the workings of a scheme of government involving the interplay of two governments, one of which is subject to limitations enforceable

---

hence, despite a finding below that the failure to file notices of appeal on time was the result of excusable neglect under Rule 45(b), the Supreme Court held that the jurisdiction of the Court of Appeals was extinguished by the expiration of the appeal period without any action having been taken by appellants to indicate their intention to appeal. (Id. at 221–230, 80 S.Ct. at 283–288). The Robinson case is clearly distinguishable from the instant case.

275. Brown v. Allen, 344 U.S. 443, 451 n. 5, 73 S.Ct. 397, 404, 97 L.Ed. 469 (1953).

Judge Charles E. Clark, referring to three presently important doctrines of the Supreme Court, has observed that " * * * the first [use of federal habeas corpus to review state criminal convictions] seems a desirable, even a necessary step toward making this a really great country not only in our own eyes, but in the eyes of the world generally. * * *

"First we may note the developing law as to the federal habeas corpus. This is truly a troublesome part of our appellate jurisdiction. * * * This is an embarrassing jurisdiction. * * * This whole course of judicial trend is a vastly interesting one; while for the individual judge the task is heavy, yet the total effect on the administration of the criminal law I am quite sure is wholly to the good."

Clark, Federal Procedural Reform and States' Rights; to a More Perfect Union, 40 Texas L.Rev. 211, 218–220 (1961).

276. Brown v. Allen, supra note 275, at 507, 73 S.Ct. at 446.

277. Mr. Justice Frankfurter's opinion in Brown v. Allen (supra note 275, at 497–513, 73 S.Ct. at 441–449), with the opinion of Mr. Justice Reed (Id. at 457–460, 73 S.Ct. at 407–408), together represent the views of the Supreme Court on the effect of state court adjudications upon federal district court disposition of habeas corpus applications, as explained by Mr. Justice Frankfurter (Id. at 497, 73 S.Ct. at 441):

"The issue of the significance of the denial of certiorari raises a sharp division in the Court. This is not so as to the bearing of the proceedings in the State courts upon the disposition of the application for a writ of habeas corpus in the Federal District Courts. This opinion is designed to make explicit and detailed matters that are also the concern of Mr. Justice Reed's opinion. The uncommon circumstances in which a district court should entertain an application ought to be defined with greater particularity, as should be the criteria for determining when a hearing is proper. The views of the Court on these questions may thus be drawn from the two opinions jointly."

278. Brown v. Allen, supra note 275, at 498–499, 73 S.Ct. at 442.

by the other, are not to be escaped by simple, rigid rules which, by avoiding some abuses, generate others.

"For surely it is an abuse to deal too casually and too lightly with rights guaranteed by the Federal Constitution, even though they involve limitations upon State power and may be invoked by those morally unworthy. Under the guise of fashioning a procedural rule, we are not justified in wiping out the practical efficacy of a jurisdiction conferred by Congress on the District Courts. Rules which in effect treat all these cases indiscriminately as frivolous do not fall far short of abolishing this head of jurisdiction."

Congress—not the courts—made the determination that the federal courts, rather than the state courts, should be the ultimate arbiters as to the enforcement of federal constitutional rights in state criminal proceedings, as Mr. Justice Frankfurter points out:[279]

"Congress could have left the enforcement of federal constitutional rights governing the administration of criminal justice in the States exclusively to the State courts. These tribunals are under the same duty as the federal courts to respect rights under the United States Constitution.

\* \* \* \* \* \*

"It is not for us to determine whether this power should have been vested in the federal courts. As Mr. Justice Bradley, with his usual acuteness, commented not long after the passage of that Act, 'although it may appear unseemly that a prisoner, after conviction in a state court, should be set at liberty by a single judge on *habeas corpus*, there seems to be no escape from the law.' Ex parte Bridges [4 Fed.Cas. 98, No. 1,862], 2 Woods (5th Cir.) 428, 432.

\* \* \* \* \* \*

"It is for this Court to give fair effect to the habeas corpus jurisdiction as enacted by Congress. By giving the federal courts that jurisdiction, Congress has imbedded into federal legislation the historic function of habeas corpus adapted to reaching an enlarged area of claims. See, e. g., Mooney v. Holohan, 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791]; Johnson v. Zerbst, 304 U.S. 458 [58 S.Ct. 1019, 82 L. Ed. 1461]."

The extent to which state court determinations of federal constitutional claims are to be given consideration by a federal court in a habeas corpus proceeding, is just this:[280]

"In exercising the power thus bestowed, the District Judge must take due account of the proceedings that are challenged by the application for a writ. All that has gone before is not to be ignored as irrelevant. *But the prior State determination of a claim under the United States Constitution cannot foreclose consideration of such a claim, else the State court would have the final say which the Congress, by the Act of 1867, provided it should not have.* Cf. Ex parte Royall, 117 U.S. 241, 248–250 [6 S.Ct. 734, 738–739, 29 L.Ed. 868]. A State determination may help to define the claim urged in the application for the writ and may bear on the seriousness of the claim." (Emphasis added)

The critical point in the state-federal distribution of responsibility in this area, as Mr. Justice Frankfurter emphasizes, is that state court adjudications of questions of law, to the extent they affect federal constitutional rights, are not binding on a federal court:[281]

"On the other hand, *State adjudication of questions of law cannot, under the habeas corpus statute, be accepted as binding. It is precisely*

---

**279.** Id. at 499–500, 73 S.Ct. at 442.

**280.** Id. at 500, 73 S.Ct. at 443.

**281.** Id. at 506, 508, 73 S.Ct. at 446.

*these questions that the federal judge is commanded to decide.*

\* \* \* \* \* \*

"Although there is no need for the federal judge, if he could, to shut his eyes to the State consideration of such issues, *no binding weight is to be attached to the State determination.* The congressional requirement is greater. The State court cannot have the last say when it, though on fair consideration and what procedurally may be deemed fairness, may have misconceived a federal constitutional right." (Emphasis added)

Nevertheless, a federal district court has discretion to give appropriate weight to relevant state court proceedings, provided it does not abdicate the primary duty imposed upon it to make an independent determination of federal constitutional claims raised by a state prisoner, regardless of state court adjudication of such claims: [282]

"These standards, addressed as they are to the practical situation facing the District Judge, recognize the discretion of judges to give weight to whatever may be relevant in the State proceedings, and yet preserve the full implication of the requirement of Congress that the District Judge decide constitutional questions presented by a State prisoner even after his claims have been carefully considered by the State courts. Congress has the power to distribute among the courts of the States and of the United States jurisdiction to determine federal claims. It has seen fit to give this Court power to review errors of federal law in State determinations, and in addition to give to the lower federal courts power to inquire into federal claims, by way of habeas corpus. Such power is in the spirit of our inherited law. It accords with, and is thoroughly regardful of, 'the liberty of the subject,' from which flows the right in England to go from judge to judge, any one of whose decisions to discharge the prisoner is final. Our rule is not so extreme as in England; § 2244 does place some limits on repeating applications to the Federal Courts. But it would be in disregard of what Congress has expressly required to deny State prisoners access to the federal courts."

Responding to the frequently expressed criticism that the habeas corpus jurisdiction of a federal district court permits, in effect, the overruling of the highest court of a state by a single federal district judge, Mr. Justice Frankfurter states: [283]

"Insofar as this jurisdiction enables federal district courts to entertain claims that State Supreme Courts have denied rights guaranteed by the United States Constitution, *it is not a case of a lower court sitting in judgment on a higher court. It is merely one aspect of respecting the Supremacy Clause of the Constitution whereby federal law is higher than State law.* It is for the Congress to designate the member in the hierarchy of the federal judiciary to express the higher law. The fact that Congress has authorized district courts to be the organ of the higher law rather than a Court of Appeals, or exclusively this Court, does not mean that it allows a lower court to overrule a higher court. It merely expresses the choice of Congress how the superior authority of federal law should be asserted." (Emphasis added)

Finally, the historic function of the writ of habeas corpus—in just such a case as the instant case—as the basic safeguard of freedom in the Anglo-American world, has been articulately summarized by Mr. Justice Frankfurter, speak-

282. Id. at 508–510, 73 S.Ct. at 447.

283. Id. at 510, 73 S.Ct. at 448.

ing for the United States Supreme Court:[284]

"The uniqueness of habeas corpus in the procedural armory of our law cannot be too often emphasized. It differs from all other remedies in that it is available to bring into question the legality of a person's restraint and to require justification for such detention. Of course this does not mean that prison doors may readily be opened. It does mean that explanation may be exacted why they should remain closed. It is not the boasting of empty rhetoric that has treated the writ of habeas corpus as the basic safeguard of freedom in the Anglo-American world. 'The great writ of *habeas corpus* has been for centuries esteemed the best and only sufficient defence of personal freedom.' Mr. Chief Justice Chase, writing for the Court, in Ex parte Yerger, 8 Wall. 85, 95 [19 L.Ed. 332]. Its history and function in our legal system and the unavailability of the writ in totalitarian societies are naturally enough regarded as one of the decisively differentiating factors between our democracy and totalitarian governments.

"The significance of the writ for the moral health of our kind of society has been amply attested by all the great commentators, historians and jurists, on our institutions. It has appropriately been characterized by Hallam as 'the principal bulwark of English liberty.' "

■■■■■ Here the State of Vermont, though not required to do so by its own Constitution nor that of the United States, nevertheless has provided appellate review in criminal cases for many years. Following denial of a fair trial by a panel of jurors who were neither impartial nor indifferent, petitioner sought to avail himself of such an appeal from his conviction of first degree murder and his sentence of life imprisonment. The Vermont Supreme Court entertained and granted his application for leave to appeal in forma pauperis, for assignment of counsel at state expense and for furnishing the trial transcript at state expense. His counsel brought home to each court concerned, as well as to the prevailing party below, the essential fact that an appeal had been undertaken and did so well within the prescribed time. The Vermont Supreme Court, however, construing for the first time a double pronged filing requirement—new to Vermont, confusing to its bar and unique among states of the Union—held, three to two, that petitioner's notice of appeal mailed to the clerk of the Supreme Court four days before due, enclosing a copy for the clerk of the County Court (who also was clerk of the Supreme Court for Windham County), though on time in the Supreme Court, was filed one day late in the County Court. The Vermont Supreme Court, "well aware of the seriousness of the situation and all its attendant consequences,"[285] sought to soften its blow in dismissing the appeal by noting that "this Court has relieved counsel of the consequences of a late appeal by granting a petition for a new trial"[286]— "where the right of appeal has been lost by reason of circumstances other than those arising from the fault of the petitioner"[287]—but observed, "A petition for a new trial, however, is not before us * * *."[288] On the following day a petition for a new trial was filed; it was argued immediately after denial of petitioner's motion for reargument of the State's motion to dismiss the appeal—on the same day. Three months later the petition for a new trial was dismissed, one judge dissenting.

Through no fault of petitioner, he finds himself in this position as baffling as it is unique: despite acts and declarations clearly manifesting not only an intent to appeal but positive, timely action imple-

284. Id. at 512, 73 S.Ct. at 448.

285. State v. Brown, 121 Vt. 459, 465, 160 A.2d 879, 883 (1960).

286. Id. at 466, 160 A.2d at 883.

287. Ibid.

288. Ibid.

menting that intent, he has been stripped of his appeal; he is the only person to whom Vermont appellate procedure has been so applied; the statutory provision pursuant to which he was stripped of his appeal had never been so applied to anyone before him and never again will be so applied; the State of Vermont not only held out to him a right of criminal appeal generally, but its highest court specifically granted him leave to appeal in forma pauperis and later, after dismissing the appeal it had granted him, virtually invited him to file a petition for a new trial to relieve him of such loss of appellate review; and in the end the high promise of state appellate review was for naught.

"The State cannot keep the word of promise to the ear of those illegally convicted and break it to their hope." [289]

## VI.

## EXHAUSTION OF STATE REMEDIES

 The Court holds that petitioner has exhausted state remedies with respect to the two federal constitutional claims raised by petitioner and ruled upon by the Court, namely, denial of a fair trial and denial of state appellate review.[290]

Following his conviction in the Windham County Court, petitioner brought two proceedings in the Vermont Supreme Court. The first, a direct appeal from the judgment of conviction, was dismissed for lack of jurisdiction May 3, 1960.[291] The Vermont Supreme Court, in dismissing the appeal, decided adversely to petitioner the constitutional claim involved:[292]

"Although by failing to take advantage of the method prescribed for appeal, the respondent has left this Court without jurisdiction to consider his case, *he has not been deprived of due process*." (Emphasis added)

The second proceeding in the Vermont Supreme Court, following its dismissal of the appeal,[293] was a petition for a new trial which was denied September 6, 1960.[294] Among the claims urged by pe-

289. Griffin v. Illinois, 351 U.S. 12, 24, 76 S.Ct. 585, 593, 100 L.Ed. 891 (1956) (concurring opinion by Mr. Justice Frankfurter).

290. Respondent at the hearing conceded that petitioner had exhausted his state remedies with respect to these two federal constitutional claims (R. 69–79 (August 14, 1961)), although later respondent sought to restrict his stipulation on the first question to the "denial of due process for failure of the trial court to grant his motion for a change of venue" (Respondent's First Proposed Findings of Fact, p. 1; Respondent's Objections to Petitioner's Requests For Findings of Fact And Respondent's Additional Proposed Findings, p. 3). Despite such concession, the Court makes its own findings and conclusions as to the exhaustion of state remedies, since this is a matter affecting the jurisdiction of the Court in this proceeding.

291. State v. Brown, 121 Vt. 459, 160 A.2d 879 (1960), reargument denied, May 27, 1960.

292. Id. at 466, 160 A.2d at 883.

293. In dismissing the appeal for lack of jurisdiction, the Vermont Supreme Court noted that under Vermont law a petition for a new trial may be granted by the Supreme Court to relieve an appellant of loss of appellate review "where the right of appeal has been lost by reason of circumstances other than those arising from the fault of the petitioner" (Id. at 466, 160 A.2d at 883):

'The respondent has cited to us a number of cases in which this Court has relieved counsel of the consequences of a late appeal by granting a petition for a new trial. There is no doubt but that this Court has used such a petition as a device for relieving a would-be appellant from the loss of his appellate review. See Nelson v. Marshall, 77 Vt. 44, 58 A. 793; Hotel Vermont Co. v. Cosgriff, 89 Vt. 173, 94 A. 496; Reynolds v. Romano, 96 Vt. 222, 118 A. 810; Walsh v. Cole, 97 Vt. 459, 123 A. 850. A petition for a new trial, however, is not before us, and it is to be noted that relief of this sort has never been granted *except in those cases where the right of appeal has been lost by reason of circumstances other than those arising from the fault of the petitioner*." (Emphasis added)

294. State v. Brown, 122 Vt. 59, 163 A.2d 845 (1960).

titioner in support of his petition for a new trial and decided adversely to petitioner by the Vermont Supreme Court, was, in the language of that court, the following:[295]

"The first ground set forth by the petitioner is that he was prejudiced by a trial before a Windham County jury and will continue to be so prejudiced, and that *he received an unfair and partial trial as a result.*" (Emphasis added)

The Vermont Supreme Court noted that among the allegations relied on by petitioner in support of his claim that he was denied a fair trial was the adverse newspaper publicity prior to the trial; that petitioner had urged his claim of prejudice in the trial court in a motion for change of venue before trial, which was denied; and that petitioner had reasserted his claim of prejudice in the trial court in a motion after verdict for a new trial and for judgment in his favor notwithstanding the verdict, which was denied.[296]

December 5, 1960 petitioner filed in the United States Supreme Court a petition for a writ of certiorari seeking direct review of the judgments of the Vermont Supreme Court entered May 3, 1960 and September 6, 1960.[297] Among the grounds urged for the granting of the petition for certiorari were the denial of a fair trial and the denial of state appellate review.[298] February 20, 1961 the petition for certiorari was denied.[299]

Congress prohibits a federal district court from granting an application for a writ of habeas corpus by a person in custody pursuant to a judgment of a state court unless the applicant has exhausted the remedies available in the courts of the state.[300]

Petitioner in the instant case has fully complied with the exhaustion of state remedies requirement as enunciated by the United States Supreme Court in Brown v. Allen:[301]

"Failure to exhaust an available State remedy is an obvious ground for denying the application. An attempt must have been made in the State court to present the claim now asserted in the District Court, in compliance with § 2254 of the Judicial Code [28 U.S.C.A. § 2254]. Section 2254 does not, however, re-

---

295. Id. at 61, 163 A.2d at 847.

296. Id. at 60–61, 163 A.2d at 846–847.

297. The petition for certiorari effectively brought up for review by the United States Supreme Court only the September 6, 1960 judgment of the Vermont Supreme Court; the petition was not filed in time to bring up the May 3, 1960 judgment for review. 28 U.S.C. § 2101 (d) and Rule 22(1) of the Rules of the Supreme Court. Failure to file a timely petition for certiorari with respect to the May 3, 1960 judgment of the Vermont Supreme Court is not fatal to the exhaustion of state remedies on the claim of denial of state appellate review, since that claim constituted the third ground in support of the petition for a new trial in the Vermont Supreme Court (122 Vt. 59, 65–66, 163 A.2d 845, 849–850); it therefore was decided adversely to petitioner by that court's September 6, 1960 judgment which was effectively brought up for review by the petition for certiorari.

298. Pet. Ex. V–C–6.

299. Pet. Ex. V–B. Brown v. Vermont, 365 U.S. 822, 81 S.Ct. 706, 5 L.Ed.2d 699, (1961).

300. 28 U.S.C. § 2254:
"An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.
"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

301. 344 U.S. 443, 502, 73 S.Ct. 437, 444, 97 L.Ed. 469 (1953) (opinion by Mr. Justice Frankfurter).

quire repeated attempts to invoke the same remedy nor more than one attempt where there are alternative remedies. Further, Darr v. Burford [339 U.S. 200, 214–217, 70 S. Ct. 587, 94 L.Ed. 761] requires 'ordinarily' an application for certiorari to the United States Supreme Court from the State's denial of relief. Cf. Frisbie v. Collins, 342 U.S. 519, 520–522 [72 S.Ct. 509, 510–511, 96 L.Ed. 541]."

Moreover, petitioner's exhaustion of state remedies in the instant case is squarely in accord with the conclusion reached by the Supreme Court in Brown v. Allen:[302]

"We conclude that all required procedure for state review of the convictions had been exhausted by petitioners in each case before they sought the writs of habeas corpus in the federal courts. In each case petitions for certiorari to this Court for direct review of the state judgments rendered by the highest court of the state in the face of the same federal issues now presented by habeas corpus had been denied.

*"It is not necessary in such circumstances for the prisoner to ask the state for collateral relief, based on the same evidence and issues already decided by direct review with another petition for certiorari directed to this Court."* (Emphasis added)

■ Failure of petitioner to have availed himself of state habeas corpus procedure in Vermont to challenge the cause of imprisonment[303] does not, under the circumstances here present, bar him from seeking federal habeas corpus relief.[304] This is particularly so in Vermont where habeas corpus is available only to challenge jurisdiction of the court over the parties or the subject matter; it may not be employed to raise due process or other federal constitutional questions.[305]

Exhaustion of state remedies in the instant case follows closely the pattern approved by the United States Supreme Court in Irvin v. Dowd.[306] In that case, appellant urged upon the Indiana Supreme Court on his appeal from a conviction for murder, certain constitutional claims which had been presented to the trial court in his motion for a new trial, which motion was denied.[307] The Indiana Supreme Court held that the trial court had properly denied the motion for a new trial on the ground that appellant was an escapee when the motion was filed;[308] but the Indiana Supreme Court nevertheless proceeded to review the con-

302. Id. at 447, 73 S.Ct. at 402 (opinion by Mr. Justice Reed).

303. Vt.Stat.Ann. tit. 12, § 3952 (1959).

304. Brown v. Allen, supra note 301, at 447, 502, 73 S.Ct. at 402, 443.

305. In re Moses, 122 Vt. 36, 39, 163 A.2d 868, 871 (1960); In re Thompson, 111 Vt. 7, 11, 9 A.2d 107, 109 (1939); In re Turner, 92 Vt. 210, 214, 102 A. 943, 945 (1918). But see In re Greenough, 116 Vt. 277, 282–284, 75 A.2d 569, 573–574 (1950).

306. 359 U.S. 394, 79 S.Ct. 825, 3 L.Ed.2d 900 (1959).

307. In the instant case, petitioner's motion for a new trial in the trial court included the allegation "that a fair trial was not had by the petitioner in Windham County because of adverse newspaper publicity prior to the trial" (122 Vt. 59, 60, 163 A.2d 845, 846). His petition for a new trial in the Vermont Supreme Court included the same allegation, as well as the claim that he had been denied state appellate review as a result of the dismissal of his appeal for lack of jurisdiction (Id. at 61, 65, 163 A.2d at 847, 849).

308. In the instant case, the Vermont Supreme Court, noting that petitioner's claim of denial of a fair trial had been urged upon the trial court which had rejected the claim in denying the motion for a new trial, stated: "It has long been the law in this jurisdiction that a new trial will not be granted by this Court where it has been denied by the trial court on a motion made on the same grounds. Stilphen v. Read, 64 Vt. 400, 401, 23 A.2d 725" (Id. at 61, 163 A.2d at 847).

stitutional claims of appellant in view of the gravity of the crime of which he stood convicted [309] and stated:[310]

"Our decision on the point under examination makes it unnecessary for us to consider the other contentions of the appellant; however, because of the finality of the sentence in the case we have reviewed the evidence to satisfy ourselves that there is no miscarriage of justice in this case.

\* \* \* \* \* \*

"It does not appear from the record and argument had, that the appellant was denied due process of law under the Fourteenth Amendment \* \* \*."

After reviewing the scope of the decision by the Indiana Supreme Court upon the constitutional questions involved, the United States Supreme Court held:[311]

"Rather the court proceeded to determine the merits 'because of the finality of the sentence' and 'to satisfy ourselves that there is no miscarriage of justice.' In this way, in our view, the State Supreme Court discharged the obligation which rests upon 'the state courts, equally with the courts of the Union, \* \* \* to guard, enforce, and protect every right granted or secured by the constitution of the United States \* \* \*.' Robb v. Connolly, 111 U.S. 624, 637 [4 S.Ct. 544, 551, 28 L.Ed. 542]. We thus believe that the opinion is to be read as rested upon the State Supreme Court's considered conclusion

that the conviction resulting in the death sentence was not obtained in disregard of the protections secured to the petitioner by the Constitution of the United States.

"In this posture, 28 U.S.C. § 2254 does not bar the petitioner's resort to federal habeas corpus.

\* \* \* \* \* \*

"We therefore hold that the case is governed by the principle that the doctrine of exhaustion of state remedies embodied in 28 U.S.C. § 2254 does not bar resort to federal habeas corpus if the petitioner has obtained a decision on his constitutional claims from the highest court of the State, even though, as here, that court could have based its decision on another ground."

In the instant case, as in Irvin v. Dowd, this Court reads the opinion of the Vermont Supreme Court [312] "as rested upon the State Supreme Court's considered conclusion that the conviction resulting in the [life imprisonment] sentence was not obtained in disregard of the protections secured to the petitioner by the Constitution of the United States." [313]

 Finally, in determining whether petitioner has exhausted his state remedies with respect to the federal constitutional claims raised by him and ruled upon by this Court, the practical question may well be asked: "What more could petitioner have done than he already has done to have given the Vermont state courts first crack at

309. In the instant case, because of the capital crime involved, the Vermont Supreme Court likewise considered each ground upon which petitioner sought a new trial, including denial of a fair trial and denial of state appellate review (Id. at 66, 163 A.2d at 850):
"Because the crime of which the petitioner stands convicted is a capital one, and with the realization that our power to grant a new trial is of broad scope and without limitation as to the grounds upon which such new trials may be granted, we have considered not only each separate ground upon which the

petitioner seeks a new trial, but the cumulative effect of them considered together."

310. Irvin v. State, 236 Ind. 384, 392–393, 394, 139 N.E.2d 898, 902 (1957), cert. denied, 353 U.S. 948, 77 S.Ct. 827, 1 L. Ed.2d 857 (1957).

311. Irvin v. Dowd, supra note 306, at 404, 406, 79 S.Ct. at 831, 832.

312. State v. Brown, supra note 294.

313. Irvin v. Dowd, supra note 306, at 404, 79 S.Ct. at 831.

deciding the constitutional questions here involved?" In the opinion of this Court, there is nothing more that petitioner effectively could have done. And of course the law does not require, even in complying with the exacting requirements of federal habeas corpus jurisdiction, that a state procedure be invoked the objective of which is known to be futile before it is invoked.[314]

## VII.

### RESPONDENT'S MOTION TO DISQUALIFY FEDERAL JUDGE

At the beginning of the fourth session of the hearing in this habeas corpus proceeding, on August 16, 1961, counsel for respondent made an oral motion "that the Court declare the proceedings heretofore had in the last two days, null and void, and ask that he disqualify himself from further consideration of the Petition of Frank Brown for a Writ of Habeas Corpus."[315] The basis of the motion was said to be that "statements in the record indicate a predilection on the part of the Court towards one side of this case, and feel further, that the Court has been acting in an advocate's capacity and not as a judge."[316]

After hearing argument by counsel for respondent in support of his oral motion, the Court denied the motion but with leave to respondent "to file a formal motion of disqualification, supported by affidavit or affidavits, if it is so advised; the Court will reconsider the motion in the light of such formal motion and affidavits."[317]

On August 30, 1961 counsel for respondent filed a written motion, *not supported by affidavits*, requesting the undersigned "To disqualify himself from further action herein on the grounds of his prejudgment of the issues and his advocacy of the cause of the petitioner and, therefore, his bias and prejudice in this case against the respondent * * " and further requesting the undersigned "To declare null and void the proceedings heretofore had on the petition. * * "[318] The grounds of the written motion were stated to be "all as set forth in the oral motion of respondent and as appears in the record of the hearing held in Brattleboro on August 14, 15 and 16, 1961."[319]

314. Referring to the Vermont habeas corpus procedure, supra notes 303 and 305. Brown v. Allen, supra note 301, at 447, 502, 73 S.Ct. at 402, 443.

> Mr. Justice Brennan recently stated: "Too many States limit state habeas corpus or other post conviction remedies to situations where the trial court which convicted the prisoner had no jurisdiction over his person or over the crime charged or where its sentence was beyond the statutory limits of punishment. [Citing Daniels v. Allen, 344 U.S. 443, 510, 73 S. Ct. 397, 437, 97 L.Ed. 469 (1953)]. In such cases the state prisoner has no recourse but to resort to his federal remedy. Any resulting embarrassment to the state judiciary in the upset of such a conviction is largely of the State's own making. Several States have redressed this omission in their procedures. * * * I have the personal conviction that if such procedures were the rule and not the exception, redress by state judiciaries of violations of the Federal Constitution would ordinarily result, and intervention by any federal court including the United States Supreme Court would become unnecessary. And surely a more tolerant attitude by state courts towards mere procedural defaults when serious constitutional claims are pressed by state prisoners would also help relieve the tensions." [Citing, e. g., State v. Johnson, 34 N.J. 212, 223–229, 168 A.2d 1, 7–11 (1961)].
>
> Address by Mr. Justice Brennan, Federal Habeas Corpus And State Prisoners: An Exercise In Federalism, University of Utah, October 26, 1961, pp. 32–33.

315. R. 201 (August 16, 1961).

316. Ibid.

317. R. 211 (August 16, 1961).

318. Respondent's "Motion That Judge Disqualify Himself From Further Action Herein And Declare Proceedings Heretofore Had On Petition Null And Void," filed August 30, 1961, in this proceeding (Civ.No. 3275).

319. Ibid.

On September 12, 1961, after hearing argument by counsel for both sides on the written motion, the Court ruled as follows: [320]

"The Court denies the motion, and adheres to the ruling made at the time the motion was first made, as reflected on page 211 of the record, and continues to grant leave to the respondent if at any time in the proceeding he wishes to renew the motion in accordance with the manner suggested by the Court on page 211. The Court will be glad to continue to hear the respondent in support of such motion."

Failure of respondent to file an affidavit in support of the motion to disqualify and failure of respondent's counsel to file a certificate that the motion was made in good faith, required denial of the motion for non-compliance with the statute.[321] It is "well established that the statute is to be given the utmost of strict construction in order to safeguard the judiciary from frivolous attacks upon its dignity and integrity." [322]

Aside from the failure of respondent and his counsel to comply with the statutory provisions regarding timeliness, a supporting affidavit and a certificate of good faith, the gravamen of respondent's complaint was that the Court asked questions and insisted upon searching the record.[323] At least since the days of Socrates, asking questions has been recognized as a method of ascertaining truth.[324] Moreover, "the object of habeas corpus is to *search records* to pre-

320. R. 29 (September 12, 1961).

321. 28 U.S.C. § 144:

"Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

"The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

322. United States v. Valenti, 120 F.Supp. 80, 83 (D.N.J.1954), and cases cited at p. 83.

323. R. 201–211 (August 16, 1961):
"MR. DEBEVOISE:
 * * * * * *

"In support of that [respondent's motion to disqualify the judge], we mention the *questions which have been raised by the Court* * * *. (R. 201)
 * * * * * *

"*The Court also questioned* the adequacy of six peremptory challenges, under the law. (R. 202)
 * * * * * *

" * * * * we believe that it also is an indication that the Court is acting as an advocate and *searching the record.* (R. 203)
 * * * * * *

"And, that we urge, in support of our motion, and further, remarks of the Court, *the question of the Court,* why the Supreme Court Clerk didn't simply pick up the phone to call counsel when the papers arrived on the last day. (R. 205)
 * * * * * *

"Now, there are other things, *the questions of the Court* yesterday concerning, is there a county where a trial can be had free from prejudice * * *. (R. 206)
 * * * * * *

"We believe that the Court's raising these matters, which have not been raised by the four counsel for Petitioner here, indicates that the Court is acting in an advocacy, as an advocate, and is *searching the record* for errors, to sustain an Opinion, that has already been formed." (R. 207)
R. 160 (August 15, 1961):
" * * * * I should also mention, in Vermont, the Vermont Supreme Court does not *search the record.*"

324. Ironically, the record shows that respondent's counsel repeatedly invited the Court to ask questions in this proceeding. R. 191 (August 15, 1961); R. 214, 215, 225–226, 231, 280 (August 16, 1961). For example (Id. at 231):
"MR. DEBEVOISE: At this time, your Honor, I would attempt to answer

vent illegal imprisonments."[325] (Emphasis added) And "it is never too late for courts in habeas corpus proceedings to look straight through procedural screens in order to prevent forfeiture of life or liberty in flagrant defiance of the Constitution."[326]

Even if respondent had set forth his grounds of alleged bias or prejudice in an affidavit as required by the statute, they would have been insufficient as a matter of law; for "[t]he conduct and rulings of the trial judge in the case itself provide no basis for an affidavit of bias or prejudice."[327] The United States Supreme Court has held [328] that the statute authorizing the filing of an affidavit of bias or prejudice "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made, for such rulings are reviewable otherwise * * *."[329]

It is not mere bias alone but *personal bias* which is the statutory ground for disqualification of a federal judge.[330] Judge Frank's classic commentary on bias or prejudice in judicial officers [331] is worthy of note in the light of respondent's claims in the instant case.

the questions of the Court, posed last evening, and I hope that many questions of the Court will be raised in connection with them."

325. Brown v. Allen, 344 U.S. 443, 553, 73 S.Ct. 397, 433, 97 L.Ed. 469 (1953) (opinion by Mr. Justice Black).

326. Id. at 554, 73 S.Ct. at 434.

327. Chessman v. Teets, 239 F.2d 205, 215 (9 Cir.1956), rev'd on other grounds, 354 U.S. 156, 77 S.Ct. 1127, 1 L.Ed.2d 1253 (1957); United States v. Lattimore, 125 F.Supp. 295, 296 (D.D.C.1954), aff'd in part and rev'd in part, on other grounds, 94 U.S.App.D.C. 268, 215 F.2d 847 (D.C.Cir.1954).

328. Ex parte American Steel Barrel Co., 230 U.S. 35, 44, 33 S.Ct. 1007, 1010, 57 L.Ed. 1379 (1913).

329. Likewise under Vermont law, adverse rulings during the course of a trial are not grounds for disqualification of a judge. Leonard v. Willcox, 101 Vt. 195, 215, 142 A. 762, 771 (1928).

330. In re Union Leader Corp., 292 F.2d 381, 388-389 (1 Cir.1961); Knapp v. Kinsey, 232 F.2d 458, 466 (6 Cir.1956), cert. denied, 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956); Tucker v. Kerner, 186 F.2d 79 (7 Cir.1950); Craven v. United States, 22 F.2d 605, 607-608 (1 Cir.1927), cert. denied, 276 U.S. 627, 48 S.Ct. 321, 72 L.Ed. 739 (1928).

331. In re Linahan, 138 F.2d 650, 651 (2 Cir.1943):
"Appellants entertain a fundamentally false notion conception of the prejudice which disqualifies a judicial officer.
"Democracy must, indeed, fail unless our courts try cases fairly, and there can be no fair trial before a judge lacking in impartiality and disinterestedness. If, however, 'bias' and 'partiality' be defined to mean the total absence of preconceptions in the mind of the judge, then no one has ever had a fair trial and no one ever will. The human mind, even at infancy, is no blank piece of paper. We are born with predispositions; and the process of education, formal and informal, creates attitudes in all men which affect them in judging situations, attitudes which precede reasoning in particular instances and which, therefore, by definition, are pre-judices. Without acquired 'slants,' pre-conceptions, life could not go on.
* * * * * *
"The conscientious judge will, as far as possible, make himself aware of his biases of this character, and, by that very self-knowledge, nullify their effect. Much harm is done by the myth that, merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilections, becomes a passionless thinking machine.
* * * * * *
"But, just because his fact-finding is based on his estimates of the witnesses, of their reliability as reporters of what they saw and heard, it is his duty, while listening to and watching them, to form attitudes towards them. He must do his best to ascertain their motives, their biases, their dominating passions and interests, for only so can he judge of the accuracy of their narrations. He must also shrewdly observe the stratagems of the opposing lawyers, perceive their efforts to sway him by appeals to his predilections. He must cannily penetrate through the surface of their remarks to their real purposes and motives. He has an official obligation to become prejudiced in that sense. Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those

 This Court fully recognizes that "The participation of a district court through habeas corpus proceedings in determining whether state prisoners have been granted a fair trial is a sensitive area in our federated system."[332] Such participation by a district judge is not made easier when challenged by a motion to disqualify because of alleged bias and prejudice. The judge's duty when thus challenged, however, has been succinctly stated by Judge Smith in denying a motion to disqualify him as a district judge in a habeas corpus proceeding involving the legality of the detention of a state prisoner:[333]

"Questions posed by those cases brought to test the constitutionality of state court rulings are not easy. Neither their difficulty nor the sort of attack made in the instant affidavit, however, would justify transferring the burden to another judge without the fulfillment of the statutory requirements, for it is the duty of the judge to act if the motion is based on insufficient grounds."

Here the motion not only was based on insufficient grounds; it was made and reasserted in plain disregard of the statute, despite the judge's repeated suggestions to counsel that he comply with the statute. Accordingly, it was the duty of the judge to act and he has.

## VIII.

## OTHER QUESTIONS RAISED BUT NOT RULED ON BY THIS COURT

Petitioner has sought to raise in this proceeding, in addition to the questions on which the Court has ruled, certain federal constitutional questions upon which the Court has not ruled,[334] based on the following claims:[335]

(1) Systematic exclusion of Jews from the panel of veniremen from which the petit jury was drawn in the Windham County Court.

(2) Denial of a new trial in view of the conflict in verdicts returned by (a) the jury in the criminal case in the Windham County Court which convicted petitioner of arson causing death and (b) the jury in the subsequent civil

---

court-house dramas called trials, he could never render decisions.

"His findings of fact may be erroneous, for, being human, he is not infallible; indeed, a judge who purports to be superhuman is likely to be dominated by improper prejudices. When upper court judges on an appeal decide that the findings of a trial judge are at fault because they—correctly or incorrectly—think those findings insufficiently supported by relevant and competent evidence, that appellate decision does not brand him as partial and unfair. When, his decision reversed because of errors in his findings of fact or conclusions of law, the case comes back to his court for a further hearing, he will not, if he is the kind of person entitled to hold office as a judge, permit his previous decision in the case to control him."

332. Brown v. Allen, 344 U.S. 443, 451 n. 5, 73 S.Ct. 397, 404, 97 L.Ed. 469 (1953), citing Speller v. Crawford, 99 F.Supp. 92, 96 (E.D.N.C.1951), aff'd per curiam, 192 F.2d 477 (4 Cir.1951), and Smith v. Baldi, 192 F.2d 540, 543 (3 Cir.1951), aff'd, 344 U.S. 561, 73 S.Ct. 391, 97 L. Ed. 549 (1953).

333. United States ex rel. Rogers v. Richmond, 178 F.Supp. 44, 48 (D.Conn.1958), citing: Tucker v. Kerner, 186 F.2d 79 (7 Cir.1950); Eisler v. United States, 83 U.S.App.D.C. 315, 170 F.2d 273, 278 (D.C.Cir.1948), petition for cert. dismissed per curiam, 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542 (1949); In re Federal Facilities Realty Trust, 140 F.Supp. 522 (N.D.Ill.1956), rev'd on other grounds, 220 F.2d 495 (7 Cir.1955); United States v. Valenti, 120 F.Supp. 80, 83 (D.N.J.1954); United States v. Shibley, 112 F.Supp. 734, 748 (S.D.Cal. 1953); United States v. Murphy, 19 F. Supp. 987, 988 (W.D.Mo.1937).

334. Counsel for the parties to this proceeding have submitted proposed findings of fact which have been of great help to the Court. To the extent that the proposed findings relate to "such essential facts as lay a basis for the decision" herein, they have been relied on. 5 Moore's Federal Practice, ¶52.06[1], p. 2659 (2d ed. 1951).

335. Petition For Writ Of Habeas Corpus, sworn to July 15, 1961, pp. 4–5; Replication Of Petitioner To Respondent's Return And Answer, sworn to August 10, 1961, pp. 6–7.

case brought in the United States District Court to collect fire insurance which by special verdict found the fire was not of incendiary origin.

(3) Denial of a new trial in view of newly discovered evidence of a technical nature, i. e. testimony of two expert witnesses, the claim being that such evidence would be sufficient to change the result of the trial in the criminal case and in fact did lead to a different result in the subsequent civil case in the federal court.

(4) Denial of a fair trial in view of the commission of such errors as:

(a) Admission of incompetent and prejudicial expert testimony on the ultimate question to be decided by the jury, i. e. whether arson was committed.

(b) Withholding from petitioner the results of lie detector tests voluntarily taken by him.

(c) Denial of a motion for a directed verdict at the close of the State's case by a one-to-one vote of the members of the trial court, i. e. the presiding judge and the "assistant judge."

(d) Improper argument to the jury by the prosecutor who expressed his personal opinion as to the guilt of petitioner.

(e) Erroneous charge to the jury by the trial court on questions of lack of motive, presumption of innocence and failure of petitioner to take witness stand.

The Court has not ruled on the federal constitutional questions which petitioner has sought to raise on the basis of the foregoing claims, for one or more of the following reasons:

(i) No substantial federal constitutional question is presented by the claim as stated; or

(ii) The record does not permit the Court to make adequate findings of fact on the question presented; or

(iii) Petitioner has not exhausted his state remedies with respect to the question presented.

Moreover, since the Court has ruled that petitioner must be discharged unless the State of Vermont within a reasonable time corrects the defects which render discharge necessary, a ruling by the Court on the other federal constitutional questions sought to be raised by petitioner is unnecessary. Presumably, if petitioner is granted a new trial in lieu of immediate discharge, the State of Vermont will have adequate opportunity to cure any defects claimed by petitioner to constitute deprivation of his federal constitutional rights, in addition to those defects which this Court has ruled on the present record render discharge necessary.[336]

## CONCLUSIONS

Based on the foregoing findings of fact and evaluations of the facts as found, the Court reaches the following conclusions of law:

(1) The Court has jurisdiction over the parties and the subject matter.

(2) Petitioner, not having been accorded a fair trial by a panel of impartial, indifferent jurors, was denied due process in violation of the Fourteenth Amendment.

(3) Petitioner, not having been granted state appellate review of a conviction equivalent to first degree murder which resulted in the imposition of a sentence of life imprisonment, following failure to accord a fair trial, was denied due process and equal protection in violation of the Fourteenth Amendment.

(4) Petitioner has exhausted state remedies with respect to the two federal constitutional questions here raised and ruled upon by this Court, namely, denial of a fair trial and denial of state appellate review.

(5) Respondent's motion to disqualify the federal judge and to declare null and void the proceedings on the petition for habeas corpus, having been based on insufficient grounds as a matter of law and having been made and reasserted in disregard of the statute, required de-

---

336. Payne v. Arkansas, 356 U.S. 560, 569, 78 S.Ct. 844, 2 L.Ed.2d 975 (1960).

nial and left unimpaired the duty of the federal judge to act on the petition.

(6) The Judgment Order entered in the Windham County Court in the case of State of Vermont v. Frank Brown, Docket No. 9460, dated November 24, 1959 and filed December 3, 1959, adjudging petitioner guilty of arson causing death and sentencing him to imprisonment at hard labor in the state prison for life, is void and should be set aside.

(7) The Mittimus To State Prison, issued January 5, 1960 by the Windham County Court in said case, committing petitioner to the state prison at Windsor for the rest of his natural life, is void and should be set aside.

(8) Petitioner is entitled to be discharged from detention pursuant to said void Judgment Order and said void Mittimus To State Prison, subject, however, to the right of the State of Vermont to take petitioner promptly before the court where said judgment was rendered and with all deliberate speed to correct, if susceptible of correction, the defects which render discharge necessary, failing which petitioner should be discharged forthwith.

Congress has given the district courts power, in a habeas corpus proceeding, to "dispose of the matter as law and justice require."[337] In ordering that petitioner's discharge be delayed for a reasonable period of time to enable the State of Vermont to correct the defects which render discharge necessary, the Court does not imply that such defects are susceptible of correction. That is for the State of Vermont to determine.

Under the broad discretion given to this Court to determine the appropriate disposition of this matter, the record before the Court undoubtedly would justify exercising discretion to order an unconditional discharge. This is particularly so in view of the Court's find-

ing that the denial of a fair trial was due in large measure to the saturation coverage of the community before the trial with stories about the fire, petitioner's complicity in the alleged crime and the State's investigation of the crime, featuring its public disclosure of petitioner's alleged criminal record. Subsequent to the publicity which constitutes the basis of the Court's finding (through the empanelling of the jury), there of course has been further publicity concerning later proceedings, including: the trial of the arson case in the Windham County Court; the motion in that court for judgment notwithstanding the verdict and for a new trial; the imposition of sentence in that court; the proceedings in the Vermont Supreme Court on the motion to dismiss the appeal, the reargument of that motion and the petition for a new trial; the petition to the United States Supreme Court for a writ of certiorari; the trial in the United States District Court at Burlington of the civil case involving the same fire; and the habeas corpus proceedings in this Court. In short, the case has become a cause celebre in Vermont. The difficulties in empanelling an impartial jury originally, necessarily are compounded by the subsequent publicity stemming largely from the justifiable efforts of petitioner and his counsel to obtain correction of the miscarriage of justice at the original trial. And once the damage has been done, it is at best doubtful that restoration of fundamental constitutional rights can be accomplished "by means of expedients such as changing the venue of a trial, directing jurors to pay no attention to what they have read, heard or seen, putting a defendant to the agony of a retrial when the poison has done its work."[338]

As Mr. Justice Harlan has tersely put it,[339] "The proponent before the Court is not the petitioner but the Constitution of the United States." And aside from the denial of federal constitu-

---

337. 28 U.S.C. § 2243.

338. Lawrence, Free Press And Fair Trial (Second Circuit Judicial Conference, 1960), Appendix C, infra at 7.

339. Chessman v. Teets, 354 U.S. 156, 165, 77 S.Ct. 1127, 1132, 1 L.Ed.2d 1253 (1957).

934

tional rights which require issuance of a writ of habeas corpus here, resort to the writ in this case is also necessary to prevent a complete miscarriage of justice, in the classic language of Judge Learned Hand:[340]

> "We can find no more definite rule than that the writ is available, not only to determine points of jurisdiction, stricti juris, and constitutional questions; *but whenever else resort to it is necessary to prevent a complete miscarriage of justice.*" (Emphasis added)

 In allowing the State of Vermont an opportunity to correct the miscarriage of justice disclosed by the record in this case, the Court believes it is acting "as law and justice require."[341] But there is another reason. "Without blinking the fact that the history of this case presents a sorry chapter in the annals of * * * the administration of criminal justice"[342] in Vermont, the Court does not have the slightest doubt as to the ability and the desire of the State, given the opportunity, to expunge the blemish of this case from its escutcheon. Surely Vermont "has no interest in maintaining an unconstitutional conviction and every interest in preserving the writ of habeas corpus to nullify them when they occur."[343] Depriving a man of basic constitutional rights is offensive, not only to federal law and to the Constitution of the United States: it offends the people of Vermont.

The State of Vermont need yield to no state of the Union in its dedication to the fundamental rights preserved by the Constitution of the United States. For after all, liberty in Vermont has been coextensive with liberty in the United States. Vermonters have been in the forefront, from the earliest days of the Nation, in war and in peace, in establishing, defending and advancing our precious heritage of liberty under law. To the gallant men of this State who have fought for freedom—whether at Ben-

---

340. United States ex rel. Kulick v. Kennedy, 157 F.2d 811, 813 (2 Cir.1946), rev'd sub nom. Alexander v. United States ex rel. Kulick, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947).

It is noteworthy that, although the Second Circuit decision in the Kulick case was reversed by the Supreme Court, Judge Hand's rule defining when the writ of habeas corpus is available (based on his "extensive review of the authorities twenty-four years ago", citing Ex parte Craig, 282 F. 138, 141, 155–159 (2 Cir. 1922)), not only stands unimpaired, but is regarded as the classic definition of this head of federal jurisdiction. For example, it has been cited or quoted by Mr. Justice Black in Brown v. Allen, 344 U.S. 443, 553, 73 S.Ct. 397, 97 L.Ed. 469 (1953), by Mr. Justice Frankfurter in Brown v. Allen, id. at 558, 73 S.Ct. at 435, and by Judge Soper in Daniels v. Allen, 192 F.2d 763, 772 (4 Cir.1951), aff'd, 344 U.S. 443, 73 S.Ct. 397, 97 L. Ed. 469 (1953).

Other cases which have recognized the use of the writ of habeas corpus to prevent a miscarriage of justice are: Frisbie v. Collins, 342 U.S. 519, 520–521, 72 S.Ct. 509, 96 L.Ed. 541 (1952), cited by Mr. Justice Black in Brown v. Allen, supra at 553, 73 S.Ct. at 433, as involving "one of those 'extraordinary situations' which the Court says authorizes federal courts to protect the constitu-tional rights of state prisoners"; Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); Wade v. Mayo, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647 (1948); Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923). The Leyra, Wade and Moore cases are cited by Mr. Justice Douglas in Chessman v. Teets, supra note 339, at 172, 77 S.Ct. at 1135, as involving situations "where miscarriages of justice were prevented only through the writ of habeas corpus." See Pollak, Proposals To Curtail Federal Habeas Corpus For State Prisoners: Collateral Attack On The Great Writ, 66 Yale L.J. 50 (1956).

341. 28 U.S.C. § 2243. United States ex rel. Reid v. Richmond, 295 F.2d 83, 84 n. 2 (2 Cir.1961), cert. denied, 368 U.S. 948, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961). See also cases cited supra note 6.

342. Chessman v. Teets, supra note 339, at 164, 77 S.Ct. at 1132 (opinion by Mr. Justice Harlan).

343. Brown v. Allen, supra note 332, at 548, 73 S.Ct. at 431 (opinion by Mr. Justice Jackson). In this connection, Mr. Justice Jackson also appropriately observed (Id. at 544, 73 S.Ct. at 429):

"If a state is really obtaining conviction by laws or procedures which violate the Federal Constitution, it is always a serious wrong, not only to a particular convict, but to federal law."

nington or Tripoli or New Georgia—it is not just a sentimental concept: it is life itself. To such men, the denial of basic constitutional rights to any man—regardless of race, religion, national origin or station in life—is abhorrent.

The Court has the utmost confidence that the State of Vermont, implementing the conditional issuance by this Court of the writ of habeas corpus as the basic safeguard of freedom in the Anglo-American world—the principal bulwark of liberty—will act swiftly and wisely to correct the grave miscarriage of justice which has been inflicted upon this petitioner who has been incarcerated for more than two and one half years, two of which have been pursuant to a void judgment.

Let the Great Writ issue, subject to the right—indeed, the duty—of the sovereign State of Vermont promptly to take action appropriately to correct, if susceptible of correction, the defects which render discharge of petitioner necessary, failing which he shall be discharged forthwith.

### ORDER AND JUDGMENT

Petitioner Frank Brown, a prisoner in the Vermont State Prison at Windsor, having filed in this Court on July 18, 1961 a verified petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241, claiming that his conviction in the Windham County Court of arson causing death and his sentence of life imprisonment were obtained in violation of his federal constitutional rights, as a result of which he is being illegally detained pursuant to a void Judgment Order of the Windham County Court filed December 3, 1959 and a void Mittimus To State Prison issued by the Windham County Court January 5, 1960; and

This Court on July 20, 1961 having issued, and having caused to be served on respondent, Robert G. Smith, warden of the Vermont State Prison, on the same day, an Order To Show Cause requiring said respondent to show cause why a writ of habeas corpus should not issue; and

Respondent having filed a verified return to the said Order To Show Cause and the Attorney General of Vermont having filed a verified answer to the petition for a writ of habeas corpus; and

Petitioner, by his counsel, having filed a verified replication to the said return and answer; and

The American Civil Liberties Union, upon application, having been granted leave to participate as *amicus curiae;* and

The Court having held a hearing in Brattleboro, with sessions on July 27, August 14, 15, 16 and September 12, 1961, at which the parties submitted their proofs, including the entire record of proceedings in the Windham County Court and the Vermont Supreme Court in the case of State of Vermont v. Frank Brown, reported at 121 Vt. 459, 160 A.2d 879 (1960) and 122 Vt. 59, 163 A.2d 845 (1960); and

Petitioner having been present in person at all sessions beginning with that held August 14, 1961; and

The Court having received and considered the parties' briefs, proposed findings of fact and conclusions of law and having heard oral arguments by counsel; and

The Court having announced its decision in open court on December 22, 1961, and having concluded that the failure to accord petitioner a fair trial by a panel of indifferent jurors plus the denial of state appellate review, combined to deprive petitioner of his rights under the Constitution of the United States; it is

ORDERED, ADJUDGED AND DECREED:

(1) That petitioner's judgment of conviction and sentence of life imprisonment, being in violation of the Constitution of the United States, be, and the same hereby are, set aside as void.

(2) That the Judgment Order entered in the Windham County Court in the case of State of Vermont v. Frank Brown, Docket No. 9460, dated November 24, 1959 and filed December 3, 1959, be, and the same hereby is, set aside as void.

(3) That the Mittimus To State Prison issued January 5, 1960 by the Windham

County Court in the said case, committing petitioner to the Vermont State Prison at Windsor for the rest of his natural life, be, and the same hereby is, set aside as void.

(4) That petitioner be, and he hereby is, discharged from detention pursuant to said void Judgment Order and said void Mittimus To State Prison;

PROVIDED, that discharge of petitioner pursuant to this paragraph (4) of the ORDER AND JUDGMENT of this Court be, and the same hereby is, stayed for a period of thirty (30) days to enable the State of Vermont to take petitioner before the court where the said judgment was rendered for the purpose of correcting, if susceptible of correction, the defects which render discharge necessary in accordance with the decision of this Court, including the granting promptly of a new trial to petitioner in a county sufficiently removed from the Windham County locality to make reasonably certain that a fair trial by an indifferent jury may be had; and

PROVIDED FURTHER, that, if the State of Vermont does act within thirty (30) days in accordance with the foregoing subparagraph of this ORDER AND JUDGMENT, the said stay of discharge of petitioner shall continue for such reasonable period of time as may be required for the completion with all deliberate speed by the Vermont state courts of such proceedings as may be undertaken to correct the defects which render discharge necessary in accordance with the decision of this Court.

## APPENDIX A

UNITED STATES ex rel FRANK BROWN vs. ROBERT G. SMITH
DISTRICT OF VERMONT
Civil No. 3275

A P P E N D I X A

EVALUATION OF VOIR DIRE EXAMINATION OF JURORS EMPANELLED
AS PETIT JURY (12 REGULARS AND 2 ALTERNATES)*

| NAME OF JUROR | FAMILIARITY WITH STREETER | | | | FAMILIARITY WITH BROWN | | | READ, HEARD OR SAW PUBLICITY ABOUT CASE | | | SUBSCRIBER TO OR READER OF BRATTLEBORO REFORMER | DISCUSSED CASE WITH OTHERS | AWARE OF ANTI-JEWISH SENTIMENT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Knew him | Knew members of his family | Had hair cut by him or had been in his barber shop | Member of same fraternal order | Knew him | Knew members of his family | Traded in his drug store | In news papers | On radio | On TV | | | |
| Larabee | | | | | | | | | | | x | | |
| Isham | x | | x | x | | | | | | | x | | |
| Jenness | | | | | | | | | | | x | | x |
| Tunis | | | | | | | | | | | | | x |
| Chapin | | | | | | | | x | x | x | x | | x |
| Smith | | | | | | | | . | | | | | |
| Timmes | | | | | | | x | x | | | x | | x |
| Allen | | | | | | | | x | | | x | | x |
| Merritt | | | | | | | | x | | | | | |
| Johnson | x | x | x | x | | x | | x | | | x | | x |
| Cote | | | | x | | | | | | | | | x |
| Sibley | x | | x | | | x | | x | | | x | x | x |
| Montagne | x | | | | | | | x | x | | | | |
| Threkheld | x | | x | | | | | x | | | | x | x |

* Based on Pet. Ex. VIII, 1-125.

## APPENDIX B

UNITED STATES ex rel FRANK BROWN vs. ROBERT G. SMITH
DISTRICT OF VERMONT
Civil No. 3275

A P P E N D I X B

EVALUATION OF VOIR DIRE EXAMINATION OF PROSPECTIVE JURORS
(EXCLUDING THOSE EMPANELLED AS PETIT JURORS)*

| NAME OF PROSPECTIVE JUROR | CHALLENGED FOR CAUSE | | CHALLENGED PEREMPTORILY | | CHALLENGED FOR CAUSE BECAUSE OPPOSED TO DEATH PENALTY | | FAMILIARITY WITH STREETER | | FAMILIARITY WITH BROWN | | READ, HEARD OR SAW PUBLICITY ABOUT CASE | AWARE OF ANTI-JEWISH SENTIMENT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | By State | By Resp. | By State | By Resp. | In any case | In case of non-intentional killing | Knew Streeter or his family | Had been in his barber shop | Knew Brown or his family | Traded in his drug store | | |
| Burbank | x | | | | | | x | | | | x | |
| Newton | | | x | | | | | | | | | x |
| Sederquist | x | | | | x | | | | | | | |
| Nichols | x | | | | | | | | | | | |
| Sauer | | | x | | | | x | x | | | x | x |
| Sage | x | | | | | | x | x | | | x | |
| Allen | x | | | | | | x | | | | | |
| Jennison | | | x | | | | | | | | | |
| Albee | x | | | | x | | | | | | | |
| Holden | x | | | | x | | | | | | | |
| McCoy | x | | | | | x | | | | | | |
| Jewitt | x | | | | x | | | | | | | |
| Chase | x | | | | | x | | | | | | |
| Bruce | x | | | | | x | | | | | | |
| Corbett | x | | | | | x | | | | | | |
| Everett | x | | | | | x | | | | | | |
| Racine | x | | | | | x | | | | | | |
| Smillie | | | | | | | | x | | | | x |
| Bolster | | | x | | | | x | | | | x | x |
| Howard | x | | | | | x | | | | | | |
| Clark | x | | | | x | | | | | | | |
| Pfeiffer | x | | | | | x | | | | | | |
| Monroe | x | | | | x | | | | | | | |
| Carlson | x | | | | | x | | | | | | |
| Ladd | x | | | | | x | | | | | | |
| Evans | | | x | | | | x | x | x | | x | |
| Lyman | x | | | | | x | | | | | | |
| Cowing | | | x | | | | | | | | x | |
| O'Connor | x | | | | x | | | | | | | |
| Pike | x | | | | | x | | | | | | |
| Fifield | | | x | | | | | | | | | |
| Bailey | x | | | | x | | | | | | | |
| Wolfe | x | | | | | x | | | | | | |

* Based on Pet. Ex. VIII, 1-125.

---

## APPENDIX C

### Address by Geoffrey Lawrence, Q. C., on "Free Press And Fair Trial" Given At The Second Circuit Judicial Conference on September 10, 1960 at Manchester, Vermont

As a guest in your great country I am singularly honoured by your invitation to take part in this discussion this morning. After listening to the very interesting contributions made by the earlier speakers it appears to me that what I am being invited to give is the answer to the question "What would you do, 'chum'?" Of course I can only speak to you on the subject from our experience in England. I could not in any case approach the topic by way of an attempt to resolve a conflict between specific constitutional guarantees for at least two reasons. The first is that, as you know, we in England are not the fortunate possessors of any constitution at all—at least in the sense of any written document which is on view to the public; and the second is that with us there is no such conflict. It is commonly supposed in my country, with a measure of truth which is demonstrated by our practical life, that we have reserved and presently exemplify all the basic freedoms, including the freedom of

the press and the free right of a man to a fair trial by an impartial jury of his peers. We have so far managed to prevent these two freedoms from getting in the way either of the other. I do not wish to sound complacent when I say this, for it would be an incautious man who denied the possibility of such a conflict in any genuinely democratic community but I should be less than candid if I did not say at once that we have not been troubled by this embarrassment. I am sure you will all understand that in saying this and what I shall later add I am adopting an attitude neither of superiority nor of criticism. We are simply fortunate in having been able to avoid these difficulties and it may be of interest to you if I go a little way into the reasons, as I see them, for our immunity from the troublesome problems already discussed by my colleagues on this panel.

The first, I think, is that the law of contempt of court is clear, unequivocal and accepted generally by our community: the second is that our Courts have never hesitated, in proper cases, to enforce that law with a promptitude and sternness which have left no one, including even the most dull witted newspaper editor, in doubt what it is and what is the penalty for disobeying it. Newspaper editors are not noticeably an obtuse minded race and are mostly capable of taking a plain hint from the right direction.

That part of the English law of contempt which we are discussing this morning may be simply stated. Any speech or writing, including nowadays sound radio and television as well as newspapers and periodicals, which prejudices, obstructs or tends to prejudice or obstruct the administration of justice by the Court is a contempt. The test is not whether the offending matter does prejudice or obstruct the administration of justice: it is enough that it should tend to do so and the intention of the author or publisher

is irrelevant except in the matter of penalty. The superior courts have an inherent jurisdiction to punish a criminal contempt by a summary process which is rapid and on occasion spectacular. On a motion for the attachment or committal of the offender the Court may impose a fine of an unlimited amount; it may send the offender to prison or it may exact security for good behaviour. Until a statute to be known, when it receives the Royal Assent, as the Administration of Justice Act, 1960, the decision of the court was unappealable. There is now to be a limited right of appeal to the House of Lords in the type of case we have today in mind.

The law of contempt, as I have stated it, is no innovation in our legal system. It does not rest upon any statute passed by a legislature of repressive tendencies. The power of the court to punish contempts which tend to interfere with the due course of justice is founded on the same immemorial usage as supports the whole fabric of the common law itself. This was authoritatively stated in 1765 [1] and the statement has been cited and approved in a long line of later cases. Even earlier than this in 1742 Lord Hardwicke L.C. had said:— [2]

"There cannot be anything of greater consequence than to keep the streams of justice clear and pure that parties may proceed with safety both to themselves and to their characters."

A more modern and equally well known statement on the subject is that of Willis J. in R. v. Parke, [1903]. 2 K.B. 432, 436:—

"The reason why the publication of articles like these is treated as contempt of court is because their tendency, and sometimes their object, is to deprive the Court of the power of doing that which is the end for which it exists—namely, to administer justice duly, impartially and with reference solely to the facts

1. R. v. Almon (1765) Wilm. 243, 97 Eng. Rep. 94.

2. Re Read and Huggonson (1742), 2 Atk. 469; 26 Eng.Rep. 683.

judicially brought before it. Their tendency is to reduce the Court, which has to try the case, to impotence, so far as the effectual elimination of prejudice and prepossession is concerned."

It is not difficult, therefore, to see the pernicious consequences of prejudicing the minds of the public against persons concerned as parties before their case is finally heard and determined by the Court. The effect may be to deter witnesses from coming forward to give evidence at all; it may be to induce them to give evidence on one side alone and above all in a criminal case it may irrevocably prejudice the minds of jurors. I would venture to assert that there can be no lawyer, indeed there can be no fair-minded person, who truly appreciates the full implications of the rule of law who does not recognize the evils which may follow the publication outside the Court pending trial of matter calculated to prejudice the due course of justice. It is no exaggeration to say that in a given case it may defeat the ends of justice completely.

I have spoken of the power which our Courts unhesitatingly exercise over offenders in this regard. When I use the word "offenders", you will understand that no person has any immunity from responsibility. In the case of contempt by newspapers, the motion to attach or commit is commonly against the editor himself and cases have been known in quite recent years where that powerful and august person has suddenly found himself a compulsory guest in what used to be called a House of Correction, with ample leisure and time to reflect upon the appropriate bounds of discretion in the selection of news for publication in his newspaper.

I must guard myself, however, against the danger of conveying to you the impression that this is a tyrannical power exercised tyrannically. Its exercise by the Courts over the centuries has continued, unfettered by legislative interfer-

ence and accepted by the community as being for its protection, because the Courts have used it sparingly and wisely. The power to attach and commit to prison is arbitrary and unlimited (except for the right of appeal under the new Act); the remedy itself involves the withdrawal of the offence from the cognisance of a jury and therefore the Courts have refused and will refuse applications where the contempt is slight and will grant them only where it is probable that the publication will substantially interfere with a fair trial.

May I read to you two short extracts from judgments of the Courts which put this aspect of the matter better than I can? In Reg. v. Payne, [1896] 1 Q.B. 577, 580, Lord Russell of Killowen L.C. J. said:—

"Applications of this nature have in many cases gone too far. No doubt the power which the Court possesses in such cases is a salutary power and it ought to be exercised in cases where there is a real contempt but only where there are serious grounds for its exercise. Every libel on a person about to be tried is not necessarily a contempt of Court: but the applicant must show that something has been published which either is clearly intended, or at least is calculated, to prejudice a trial which is pending."

And in Hunt v. Clarke (1889), 58 L.J.Q. B. 490, 493; sub nom. Re O'Malley, Hunt v. Clarke, 61 L.T.R. 343, 345, 37 W.R. 724, 725; 5 T.L.R. 650, C.A., it was said by Cotton L.J.:—

"There should be no such application made unless the thing done is of such a nature as to require the arbitrary and summary interference of the Court in order to enable justice to be duly and properly administered without any interruption or interference."

The result of all this is a stable balance between the two constitutional rights. Any person awaiting his trial in a crim-

inal case, any party to a civil suit awaiting its hearing, is secure in the knowledge that the Court will protect him from prejudice, not by means of expedients such as changing the venue of a trial, directing jurors to pay no attention to what they have read, heard or seen, putting a defendant to the agony of a retrial when the poison has done its work, but by maintaining under the sanction of swift and certain punishment the paramount control of the Court in its own sphere, the administration of justice. For the newspaper, radio and television interests, it is no improper restriction of the right of free speech that first things should come first and that news and comment should not invade the sphere of the Court but that in the general interest should wait until the Court has done its own and vital work.

I should, however, again seek to avoid giving a false impression. While it would be totally wrong to suggest to you that the editorial staff of all our English newspapers are models of good taste and altruistic fairmindedness, it would be equally wrong to leave you with the view that they are all restrained from gross improprieties of sensationalism only by the watchful savagery of the Courts. I believe that with a few possible exceptions, who shall be nameless, the Press in England recognizes its responsibilities as well as its rights and accepts in the general climate of public opinion the limitations on its freedom to publish. How long it would continue to do this if the Courts showed a weakness of purpose is of course another matter. A respect for the decencies of life is much encouraged by the awareness that something immediate and unpleasant inevitably will follow a failure to observe them.

Like most principles of the common law, it seems to me that this law of contempt of court is founded not on expediency but on reason. One talks loosely of the freedom of the Press, freedom of speech and so on but these are not abstractions. You cannot find abstract liberty anywhere. It must be limited in order to be enjoyed at all. Those who would seek to justify a criminal contempt of court in the name of the freedom of the Press are not maintaining the right to any real freedom. They are arrogating to themselves a license so to misuse their own particular freedom that it may destroy another freedom not a whit less important. Is it not idle to boast that no citizen can be convicted of any offence except after due process of law, if there is another forum parallel to the Courts, usurping their jurisdiction, ignorant of the rules of evidence found by experience and wisdom to be needed for the preservation of fairness to accuser and accused alike, unwilling to observe these rules even when they are well known and pillorying in advance of his trial a man who cannot retaliate, until finally he stands condemned in the public mind before a single juror can be sworn to try him? You cannot have more than one forum of justice and still retain the right to a fair trial.

No one wants to exclude the Press from the Courts. Secret courts are anathema to our way of thought. The work of the Courts should be generally open to view and their proceedings reported. This is where the Press can and does perform a great service in preventing tyranny. But this is very different from attempting to do the work of the Court itself by means of newspaper articles or television broadcasts to which the rules of fairness and impartiality are alien and unpalatable. It is to prevent this mischief that the Courts in England have always punished serious contempt without hesitation.

I am grateful indeed for your patience in listening to me and I can end with a brief summary of our English position. The law is clear. The Courts enforce it and the people are satisfied. By these means we secure that, to adopt the words of a learned judge, the fountain of justice is not poisoned before it begins to flow. Such is our system and I humbly commend it to you.

## MEMORANDUM OF DECISION ON

**(1) RESPONDENT'S PETITION FOR CERTIFICATE OF PROBABLE CAUSE;**

**(2) RESPONDENT'S MOTION FOR STAY OF JUDGMENT; AND**

**(3) PETITIONER'S MOTION TO BE ADMITTED TO BAIL**

Jan. 12, 1962.

Subsequent to the entry of this Court's final order and judgment December 22, 1961 in this habeas corpus proceeding, respondent filed a petition for a certificate of probable cause and a motion for a stay of judgment, both stated to be in anticipation of an appeal by respondent to obtain review of this Court's order and judgment discharging petitioner unless the State of Vermont acts promptly to correct, if susceptible of correction, the defects which render discharge necessary. Petitioner has filed a motion to be admitted to bail.

The Court makes the following findings of fact and conclusions of law with respect to the three pending applications.

### FINDINGS OF FACT

(1) The Court's final order and judgment was entered December 22, 1961 and is incorporated herein by reference.

(2) The Court announced in open court December 22, 1961 its decision, findings of fact, evaluations of the facts as found and conclusions of law. Thereafter the Court filed its formal memorandum of decision (incorporated herein by reference), embodying its findings of fact, evaluations of the facts as found and conclusions of law.

(3) The crux of the Court's decision was that the failure to accord petitioner a fair trial by a panel of indifferent jurors plus the denial of state appellate review, combined to deprive petitioner of his rights under the Fourteenth Amendment; accordingly, the Court ordered that petitioner be discharged unless the State of Vermont took action within 30 days appropriately to correct, if susceptible of correction, the defects which render discharge necessary, including the granting promptly of a new trial to petitioner in a county sufficiently removed from the Windham County locality to make reasonably certain that a fair trial by an indifferent jury would be had.

(4) January 3, 1962 respondent filed in this Court a petition for a certificate of probable cause and a motion for a stay of judgment "pending review of [the Court's] decision * * * by the appellate court or courts of the federal system". At the same time respondent's counsel wrote to the Clerk of this Court requesting that he suggest to the undersigned that he act on respondent's motions not later than January 15, 1962.

(5) January 11, 1962 petitioner filed in this Court a motion to be admitted to bail.

(6) Petitioner is 57 years of age.

(7) He has had a history of coronary and acute heart failure attacks.

(8) Although originally released in $7500 bail by the Windham County Court in July 1959, that court subsequently held petitioner without bail, as a result of which petitioner has been incarcerated for more than two and one half years, two of which have been pursuant to a void judgment.

(9) During the three years which have elapsed since the occurrence of the fire December 26, 1958, out of which the charge against petitioner of arson causing death arose, proceedings have been accompanied by repeated delays. For example, although the fire occurred December 26, 1958, the indictment was not returned against petitioner until July 23, 1959, seven months later; the trial did not begin until October 26, 1959, three months later; petitioner was convicted November 5, 1959, was sentenced to life imprisonment November 24, 1959 and was committed to state prison January 6, 1960; although the Vermont Supreme Court granted petitioner leave to appeal in forma pauperis December 15, 1959, it was not until May 3, 1960, nearly five months later, that the Vermont Supreme Court dismissed his ap-

peal for lack of jurisdiction; although petitioner, virtually at the invitation of the Vermont Supreme Court, filed in that court a petition for a new trial May 4, 1960, it was not until September 6, 1960, four months later, that the Vermont Supreme Court dismissed the petition for a new trial; December 5, 1960 petitioner filed in the United States Supreme Court a petition for a writ of certiorari, which was denied February 20, 1961; upon petitioner's filing his petition for a writ of habeas corpus July 18, 1961, this Court July 20, 1961 ordered respondent to show cause July 27, 1961 why a writ of habeas corpus should not issue; July 27, 1961, although petitioner was ready to proceed immediately with the hearing on his petition, the then Attorney General of Vermont failed to appear but sent word requesting a postponement of the hearing, as a result of which the hearing was postponed until August 14, 1961; thereafter, following completion of the habeas corpus proceedings, this Court notified counsel that its decision would be announced in open court December 22, 1961; but again the then Attorney General of Vermont failed to appear, although the Court's decision, findings of fact, evaluations of the facts as found and conclusions of law were announced in open court, and the final order and judgment was entered.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over the parties to, and the subject matter of, this habeas corpus proceeding.

(2) This Court's final order and judgment of December 22, 1961, involving matters of substantial public interest, ought to be reviewed on appeal; accordingly a certificate of probable cause has been issued by this Court.

(3) Petitioner is entitled to be admitted to bail to avoid compounding the miscarriage of justice which this Court has found already has been inflicted on him and in order to avoid defeating the fundamental objective of habeas corpus.

(4) Respondent, having waived the right to a stay of the judgment of this

Court provided for in the order and judgment of December 22, 1961 and having elected to seek review of the decision of this Court "by the appellate court or courts of the federal system", has failed to establish any necessity for, much less a right to, a stay of the judgment of this Court pending appeal.

(5) Petitioner is entitled to a stay of state proceedings and of action by state authorities against petitioner pending further order of this Court, of the United States Court of Appeals for the Second Circuit or of the United States Supreme Court.

## OPINION

■ The Court believes that its order and judgment of December 22, 1961 does involve matters of substantial public interest. It ought to be reviewed on appeal. Accordingly, pursuant to 28 U.S.C. § 2253, a certificate of probable cause has been issued.

■ The Court is concerned, however, in view of the entire record, whether discharge of petitioner from state prison should be delayed pending appellate review. After all, he has been incarcerated for more than two and one half years, two of which have been pursuant to a void judgment. Substantial delay has accompanied proceedings during the three years since the fire. The relevance of such delay is not to whom it may be ascribed; indeed, some delay is properly chargeable to this Court in bringing to a conclusion this habeas corpus proceeding. The relevance of such delay as there has been is that *petitioner has been in no way responsible for it.* If the order and judgment of this Court should be affirmed and thereafter the State should elect to retry him, another two years could well elapse. He is 57 years of age. He has had a history of coronary and acute heart failure attacks. If he ultimately wins his freedom, as a result of retrial or even after state appellate review, he will have spent more than four years in jail without justification. Such a result would only compound the miscarriage of justice which this

Court has found already has been inflicted on him. To delay discharge of petitioner pending appellate review, under all the circumstances and particularly in view of this Court's findings of fact and conclusions of law embodied in its memorandum of decision of December 22, 1961, would appear to raise a grave question whether the fundamental objective of habeas corpus would not thereby be defeated.

■ Petitioner may be admitted to bail in accordance with the order of this Court entered this day and appended hereto, providing for his appearance to answer and abide by the judgment in the appellate proceeding, pursuant to Rule 8 (3) of the Rules of the United States Court of Appeals for the Second Circuit, adopting Rule 49(3) of the Rules of the United States Supreme Court. United States ex rel. Paetau v. Watkins, 164 F. 2d 457, 460 (2 Cir. 1947). See Johnston v. Marsh, 227 F.2d 528, 531, 56 A.L.R.2d 661 (3 Cir., 1955) and Judge Hastie's concurring opinion at 532.

■ For the reasons stated above, the Court denies respondent's motion for a stay of judgment pending appeal. Pursuant to 28 U.S.C. § 2251, however, the Court has provided in its order for a stay of state proceedings and of action by state authorities against petitioner pending further order of this Court, of the United States Court of Appeals for the Second Circuit or of the United States Supreme Court.

## ORDER

Respondent having filed January 3, 1962 a petition for a certificate of probable cause and a motion for stay of judgment, both stated to be in anticipation of an appeal by respondent to obtain review of the Court's order and judgment of December 22, 1961 discharging petitioner in this habeas corpus proceeding unless the State of Vermont acts promptly to correct, if susceptible of correction, the defects which render discharge necessary; and petitioner January 11, 1962 having filed a motion to be admitted to bail; and

The Court having held a hearing at Brattleboro January 12, 1962, at which counsel for the respective parties were fully heard; and

The Court having filed its memorandum of decision dated January 12, 1962, embodying its findings of fact, conclusions of law and opinion with respect to the said motions; it is

ORDERED that respondent's petition for a certificate of probable cause be, and the same hereby is, granted; and it is further

ORDERED that respondent's motion for a stay of judgment pending appeal be, and the same hereby is, denied; and it is further

ORDERED that petitioner's motion to be admitted to bail be, and the same hereby is, granted; and it is further

ORDERED that petitioner be, and he hereby is, placed forthwith in the custody of the United States Marshal for the District of Vermont; that petitioner be released by the said United States Marshal upon furnishing $5,000 bail for his appearance to answer and abide by the judgment in the appellate proceeding and upon approval by this Court of the bail bond or other security which petitioner may furnish as bail; and that petitioner remain subject to all orders of this Court, of the United States Court of Appeals for the Second Circuit and of the United States Supreme Court; and it is further

ORDERED that respondent Robert G. Smith, Warden of the Vermont State Prison, as well as all other persons acting or purporting to act under the authority of the State of Vermont, be, and the same hereby are, enjoined from taking any action, from instituting any proceeding and from doing anything whatsoever against petitioner relating to or involved in any matter connected herewith, except to prosecute the appeal in the federal courts, until further order of this Court, of the United States Court of Appeals for the Second Circuit or of the United States Supreme Court modifying or dissolving the stay herein.